10-3567-cr
United States v. Marin Moreno

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2011

(Argued: October 20, 2011          Decided: November 20, 2012)

No. 10-3567-cr

_____

UNITED STATES OF AMERICA,
*Appellee,*


-v.-

NORBY MARIN MORENO,
*Defendant-Appellant.*

_____

Before:     CABRANES, LIVINGSTON, and CARNEY, *Circuit Judges*.

Defendant-Appellant Norby Marin Moreno ("Marin") appeals from a August 20, 2010, judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*) convicting her, following a jury trial, of conspiracy to possess with intent to distribute  one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A).  Marin contends that the district court erred in denying her motion to suppress evidence seized from her motel room.  Marin argues, *inter alia*, that the evidence was seized in violation of the Fourth Amendment because (1) no exigent circumstances justified the DEA agents' warrantless entry of her motel room; (2) her consent to search was a fruit of the illegal entry; and (3)  even assuming that the agents' warrantless entry did not violate the Fourth Amendment, Marin's consent was invalid.  We AFFIRM the judgment of the district court.

Judge Carney concurs in a separate opinion.

DAVID A. LEWIS, Appeals Bureau, Federal Defenders of New York, Inc., New York, New York, *for Defendant-Appellant*.

ALI KAZEMI, Assistant United States Attorney (David C. James, Assistant United States Attorney, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

LIVINGSTON, *Circuit Judge*:

Defendant-Appellant Norby Marin Moreno ("Marin")[1] appeals from an August 20, 2010 judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*), convicting her, following a jury trial, of conspiracy to possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). The district court sentenced Marin to 120 months' incarceration, three years of supervised release, and a $200 special assessment. On appeal, Marin contends that the district court erred in denying her pretrial motion to suppress the approximately l.2 kilograms of heroin found hidden in four perfume canisters in her luggage

---

[1] We refer to the Defendant-Appellant as "Marin" because in Spanish language usage "Marin" is the patronymic and "Moreno" is the matronymic, and accepted custom is to refer to an individual by the former. *See United States v. Cuevas Pimentel*, 815 F. Supp. 81, 82 n.2 (D. Conn. 1993) (Cabranes, *J.*).

after she consented to a search of her motel room and bags on the day of her arrest. Marin first contends that the district court erred in concluding that exigent circumstances supported the warrantless entry of Drug Enforcement Agency ("DEA") agents into her room and that her consent to search was a fruit of this illegal entry and was therefore invalid. She next argues that even assuming the agents' warrantless entry was justified by an exigency, her consent to search was not voluntary.

For the reasons stated below, we conclude that the district court did not err (much less clearly err) in determining that exigent circumstances justified the agents' warrantless entry into Marin's room. Further, we find no error in the district court's finding that Marin's consent was voluntary. Accordingly, we affirm the judgment of the district court.[2]

## BACKGROUND

### 1. Evidence at the Suppression Hearing

The following background is taken from the district court's Memorandum Opinion and Order denying Marin's motion to suppress and from the testimony of DEA Special Agents Salvatore Aceves ("Aceves") and

---

[2] In light of this disposition, we need not address Marin's argument that the inevitable discovery doctrine is inapplicable in the circumstances here.

Elizabeth O'Connor ("O'Connor") at a two-day pretrial suppression hearing before Judge Charles P. Sifton.[3] We view the evidence in the light most favorable to the government. *See United States v. Worjloh*, 546 F.3d 104, 108 (2d Cir. 2008) (per curiam); *see also United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004).

On the morning of July 31, 2008, Aceves, from the DEA's New York Field Division, received information from DEA Special Agent Richard Walsh ("Walsh"), who was stationed in Bogota, Colombia, that over a kilogram of heroin was to be delivered by courier at the Metro Hotel in Queens that very day.[4] Walsh was working with the Colombian National Police (the "CNP") on an investigation into a drug trafficking organization that was ferrying large amounts of cocaine and heroin to the United States and into New York City through Panama, Guatemala, and Mexico. Pursuant to Colombian law, the CNP, working with Walsh, had placed taps on the telephones of members of the drug organization. These taps had resulted in previous substantial narcotics seizures.

---

[3] Judge Sifton presided over the suppression hearing and subsequent jury trial in this case. Judge Gleeson took over the matter after Judge Sifton's death.

[4] The Metro is actually a motel, located at 7300 Queens Boulevard, Flushing, New York.

On this occasion, Walsh, who had worked with Aceves in the New York office prior to his posting to Colombia, contacted Aceves from a Bogota "wire room" in which he was listening to calls to and from a phone associated with a high-level member of the drug organization. Walsh called to alert Aceves to the impending heroin delivery in New York City. Walsh relayed information to Aceves -- including that the drug courier would be at the Metro Hotel and that the courier's name was "Norby" -- as Walsh obtained it from the interceptions. By approximately 10:00 a.m. on July 31, Aceves had learned from Walsh over the course of several conversations

> that a heavyset Hispanic woman named Norby would be at the Metro Hotel in Room 166 with approximately 1,200 grams of heroin and that she'd be waiting for a male known only as Pintora to arrive and that either he or someone would arrive to receive the heroin; that he would be giving her $10,000. [Aceves was] also told [by Walsh] that beforehand, [Pintora] would contact [Norby] and he would tell her that he was calling on behalf of El Tio, which means the uncle. . . . [T]hat was their code to her for her to proceed as scheduled.

Walsh informed Aceves that Norby was "already there" and that the transaction would take place "at any moment," according to the intercepted conversations.

After receiving this information from Walsh, Aceves drove to the Metro Motel, arriving at approximately 12:00 noon. He established surveillance of the motel by parking his van in the parking lot outside Room 166 so that the

5

van faced the exterior door of Room 166, which opened onto the parking lot, from about 25 feet away. Aceves was soon joined by six other DEA agents, including O'Connor, who was in charge. By about 12:45 p.m., the agents had formed a perimeter around the motel. Agents were stationed in Aceves's van facing Room 166; in a second van also parked in the gravel parking lot; inside the motel, in a common area; and on Queens Boulevard near the motel's main entrance.

At approximately 12:30 p.m., as this perimeter was still being established, Aceves observed a heavyset Hispanic woman matching Walsh's description in the parking lot of the Metro Motel; he saw her approach the exterior door of Room 166. The woman, who was later revealed to be Marin, was carrying one or two small plastic bags and she held a cell phone to her ear. She stepped inside Room 166, leaving the door open, and then after a few seconds stepped outside again and looked around the surrounding area; she repeated this movement twice before finally entering the room and closing the door.

Marin had been inside Room 166 for approximately half an hour when the agents discovered that in addition to the exterior door that opened onto the parking lot where Aceves's van was stationed, Room 166 also had an interior door that opened into an interior corridor of the motel. The agents

6

were immediately concerned that because they had been unaware of the interior door when they first established their perimeter, Marin might have left Room 166 via the interior door, or Pintora or another person might have arrived without their knowledge.[5]  As Agent Aceves testified, "[t]he drug transaction could have already taken place while we were merely surveilling the exterior door."  An agent was promptly posted in the interior corridor. Shortly before 1:30 p.m., Agents O'Connor, Aceves, and Special Agent David Samilo ("Samilo") decided that Agent O'Connor would ask a female member of the motel's cleaning staff to knock on the exterior door of Room 166, with Agent O'Connor standing beside her, in  the hope that O'Connor by this measure might ascertain who was inside.

Shortly thereafter, the motel's housekeeper, accompanied by O'Connor, knocked on the exterior door of Room 166 and announced "room service or maid service" or "[s]omething to that effect."  The housekeeper wore a solid color uniform dress.  O'Connor was dressed in plain clothes -- a short sleeved white golf shirt and khaki green capri slacks -- but also wore a two-and-one-half inch gold badge on her hip that identified her as a DEA agent.  As the housekeeper knocked on the door to Room 166, Samilo, followed by Aceves,

---

[5] There was a window in Room 166, overlooking the parking lot, but the shade to that window was drawn.

approached the door from Aceves's van.  Both agents were wearing badges and bullet-proof vests over their short-sleeve shirts.

Marin opened the door in response to the housekeeper's knock.  She "made eye contact with the maid, [and] smiled," but when she saw O'Connor, "the smile dropped from her face, and she went to slam the door in [O'Connor's] face."  O'Connor, who did not have her weapon drawn and was unaware whether Marin was armed or had another person in the room, first put up her hand to block the door, announcing "calm," "tran[q]uila" and "we are the police," and then, as Marin resisted, grabbed her wrist, pushing the door open and calling for Agent Samilo's help.  With Samilo's assistance, the altercation was over within seconds, as O'Connor successfully handcuffed Marin inside the motel room.  During that same brief interval, Aceves entered the room with his gun drawn and conducted a brief security sweep; after ascertaining that no one else was in Room 166, he holstered his weapon.  The agents, aware from Agent Walsh's information that Pintora or his associate could be arriving to meet the courier at any moment, secured the room by closing the doors.

After Marin was seated on a chair, Aceves, who is fluent in Spanish, spoke with her, eliciting her name, "where she was coming from, [and] when she arrived."  He also translated for O'Connor, who in addition to speaking

with Marin was responding to phone calls from other agents on the surveillance operation. Marin was calm. O'Connor told her, in substance, that it was in her interest to cooperate and that "if there's something here that shouldn't be here it's in your best interest to tell us now while you can before we find it on our own." After a brief interval during which the agents continued to wait for the arrival of Pintora or his associate, Aceves asked for Marin's consent to search the room and her bags. Marin immediately agreed to the search, adding that her bags had already been searched by Customs officials upon her arrival at John F. Kennedy International Airport ("JFK") that morning.

After Marin orally consented to search, Aceves provided her with a written consent to search form, in English, which he then translated into Spanish for her, in writing, line by line. The form noted that Marin had been asked to permit the search of her room and bags, and stated that "[she had] not been threatened, nor forced in any way" to consent. The form provided, in closing, that "I freely consent to this search." In addition to writing out the form's contents in Spanish for Marin to read, Aceves, who previously worked as a DEA translator, also read the form aloud to Marin in her native tongue. He confirmed with her that she understood the form's contents. The form was

then signed by Marin, O'Connor, and Aceves.[6]

After obtaining Marin's consent, the agents proceeded to search a black suitcase, a camouflage suitcase, a red handbag, a brown purse, a lime green purse, and various other items scattered about the room. During the search, Samilo discovered a metal perfume canister concealed deep within one of the suitcases. The canister was wrapped in clothing. Samilo removed the lid and sprayed perfume. He then continued to search the suitcase and discovered three similar perfume canisters. The canisters "appeared to be normal perfume canisters; however, they weren't weighted the way a liquid should be weighted. They didn't slosh around a bit, but they were heavy as if they were full." As Aceves and Samilo were examining the canisters, Marin volunteered that the canisters did not belong to her. Aceves pried the interior lid off one of the canisters and discovered a brown substance hidden inside the canister which field tested positive for heroin.

Marin and her belongings, including the canisters with the heroin, were then transported to the New York Field Office for processing. A lab report prepared after Marin's arrest indicated that the confiscated heroin had a net

---

[6] Marin was handcuffed consistent with DEA protocol and, as O'Connor testified, because "quite frankly . . . she resisted once, and I didn't want her to do it again." Marin's handcuffs were removed so that she could sign the consent form. She was handcuffed again during the search of the motel room and her bags.

weight of 1209 grams (almost precisely the amount that the courier was to be carrying, according to the information relayed by Walsh from the intercepted phone conversations in Colombia) and a purity of 93.5 percent. According to Agent Aceves, "[a]nything above [a purity of] 80 [percent] would be considered extremely good quality heroin. This is almost -- I've never seen anything above 80." The canisters each contained "a very, very small amount of perfume . . . [t]he rest of it was all heroin."

## 2.    *The District Court's Decision*

Marin was indicted on two counts, for conspiracy to possess with intent to distribute a kilogram or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Prior to trial, Marin moved to suppress the physical evidence seized from her room.[7] After a hearing held on November 25 and 26, 2008, the district court denied the motion to suppress the physical evidence. On

---

[7] Marin also moved to suppress certain statements she made in response to questioning about whether she was the only occupant in the room, whether the suitcases belonged to her, whether the cell phone was hers, and when and where she purchased it. The government conceded that these statements were inadmissible pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and did not offer testimony at trial regarding them.

February 24, 2009, following trial, the court issued an order memorializing its reasons for denying the suppression motion and setting forth its findings of fact and conclusions of law. *See United States v. Marin Moreno*, No. 08-cr-605 (CPS), 2009 WL 454548 (E.D.N.Y. Feb. 24, 2009). As relevant here, the district court concluded that exigent circumstances justified the agents' entry into Marin's motel room without a warrant. *Id*. at \*8. The district court cited our decision in *United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (en banc), which sets forth illustrative factors to be considered in evaluating whether, given the totality of the circumstances, "law enforcement agents were confronted by an 'urgent need' to . . . take action," *id*. at 769. Drawing on the analysis in *MacDonald*, the court reasoned that exigent circumstances justified entry because

> [t]he agents were faced with a situation (1) involving the serious offense of narcotics trafficking; (2) where it was unknown whether the defendant was armed, or whether she was alone, as the agents reasonably believed an accomplice might have been present in the room; (3) where the defendant's description and location precisely matched the information obtained by Agent Aceves from Agent Walsh, which, having been determined to be sufficiently reliable, and together with defendant's observed demeanor, established probable cause that defendant was or soon would be committing the crime; (4) where, based on their surveillance, the agents believed the defendant was in the room at the time; and (5) the agents' entry into the room, while unwelcome and met with resistance, did not result in any injury to the

12

> defendant or any damage to the hotel property. Finally, the offense involved powdered heroin, which could be disposed of in a toilet at the first indication that DEA agents sought to speak with the defendant or gain access to the room.

*Marin Moreno*, 2009 WL 454548, at \*8 (citation omitted).

The district court also found that Marin's consent to search was voluntary. It noted that the following factors weighed against this finding: that at least Aceves entered Room 166 with his weapon drawn; that O'Connor and Samilo briefly struggled with Marin and handcuffed her prior to her giving of consent; and that the agents "failed to advise defendant of her right to refuse consent, and that Agent O'Connor advised defendant that it was in her best interests to cooperate." *Id*. at \*7. But the district court found that

> [a]side from these circumstances . . . [Marin] has submitted no . . . evidence that her consent was not voluntary, and indeed fails to allege that she was coerced into giving consent. The atmosphere of the encounter between the DEA agents and the defendant, while clearly not friendly, does not appear to have been unduly hostile. There is no allegation that the agents used intimidating or coercive language or gestures in an attempt to secure defendant's consent.

*Id*. The district court emphasized that Marin "provided oral consent [to search] immediately upon request" and she "stat[ed] that her bags had already been searched at the JFK airport." *Id*. Based on all the facts and

13

circumstances, the court concluded that Marin's consent was voluntary.[8] *Id.*

## 3. *The Trial*

Trial began on December 8, 2008. During its case-in-chief, in addition to the evidence presented at the suppression hearing and already discussed, the government introduced proof regarding certain telephone calls received on the cellular phone in Marin's possession while the DEA agents were searching her room. The caller in these calls stated that he was calling for "Norby," "on behalf of El Tio," further corroborating the information obtained from Agent Walsh to the effect that Pintora would contact Norby and tell her he was calling on behalf of El Tio before arriving to take possession of the drugs. Marin was also shown to have three SIM cards at the time of her arrest.[9] DEA Special Agent Robert Garcia testified that drug traffickers commonly possess multiple SIM cards, as a cellular phone user can effectively change her

---

[8] The district court also concluded that, in any event, the heroin in Moreno's luggage would have been inevitably discovered during an inventory search of her bags, and was thus admissible, *see Nix v. Williams*, 467 U.S. 431, 447 (1984) (holding that unlawfully seized evidence should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation), an issue this Court does not reach.

[9] "A SIM, or 'security identity module,' card is the device within a phone that contains the unique information identifying a particular subscriber." *United States v. Bucci*, 525 F.3d 116, 125 n.6 (1st Cir. 2008).

number at will by using a new card. Finally, proof was offered that upon arriving at JFK, Marin listed a false destination address of "5921 Callow, New York," on her Customs declaration. The government called Patricia Carrasquilla, the individual residing at that address, who testified that she met Marin two or three years ago, but had not spoken to her since, and that Carrasquilla was unaware Marin had traveled to New York in July 2008.

Marin testified in her own defense. She described a history of hostility against her family in Colombia by local paramilitary groups and claimed that she came to the United States to find out what happened to her two children, who had disappeared. Marin denied bringing heroin into the United States and alleged the drugs had been placed in her suitcase after her arrival at the motel as part of an effort by members of these paramilitary groups to frame her. She claimed that she left Room 166 to go shopping and, upon returning, found both doors to the room open.[10] Marin admitted, however, that she did not report this incident to the front desk, but instead took a nap. The DEA agents arrived shortly thereafter. Marin claimed that the agents turned her around while searching her belongings so that she could not fully see what was happening. She denied ever before seeing the canisters found in her

_____

[10] She also testified that while showering in Room 166, she heard her motel door being opened.

luggage. Marin also denied bringing drugs into the country in April 2007, a previous occasion on which she traveled to New York. She admitted, however, that she had listed a cousin's address as her destination address on a Customs declaration form for that trip when, in fact, she did not see her cousin and she stayed, not with her cousin, but at the Metro Motel.

The government in rebuttal introduced evidence from the manager of the Metro Motel to the effect that both doors to Room 166 have an automatic close-and-lock mechanism so that they cannot be left ajar, much less open, unless the doors are physically blocked from closing. In addition, Agent Aceves testified (contradicting Marin) that the defendant watched the agents as they searched her bags, and that he personally field tested the substance removed from one of the perfume canisters in front of her, and then informed her that the substance was heroin.

The jury began deliberating on December 15, 2008, and returned a verdict of guilty on both counts that same day.

## DISCUSSION

When evaluating a district court's decision denying a motion to suppress, "we review the [district] court's factual findings for clear error, viewing the evidence in the light most favorable to the government." *Worjloh*,

16

546 F.3d at 108.  We review *de novo* the legal issues presented by a motion to suppress.  *See United States v. Howard*, 489 F.3d 484, 490-91 (2d Cir. 2007).

"The reasonableness of police action is a 'mixed question of law and fact' that is reviewed *de novo*."  *United States v. Reyes*, 353 F.3d 148, 151 (2d Cir. 2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  Therefore, the ultimate determination of whether a search was objectively reasonable in light of exigent circumstances is a question of law reviewed *de novo*.  *Id.*; *see also, e.g., United States v. Goree*, 365 F.3d 1086, 1090 (D.C. Cir. 2004).  Given the heavily fact dependent nature of the exigency inquiry, however, the lower court decision will almost invariably rest on factual determinations about the extent of the exigency, and therefore our review is usually, in practice, for clear error.  *See United States v. Klump*, 536 F.3d 113, 117 (2d Cir. 2008).  Under clear-error review, we must be "left with the definite and firm conviction that a mistake has been committed" in order to reverse a district court's exigent circumstances finding.  *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008) (internal quotation marks omitted).

We similarly review a district court's finding that consent to search was voluntary for clear error.  *See United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973) ("Voluntariness is a question of fact to be determined from all the

circumstances . . . .").  "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search."  *Garcia v. United States*, 56 F.3d 418, 422 (2d Cir. 1995).

1.    *Exigent Circumstances*

It is well-settled, as we have repeatedly said, "that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay."  *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992).  Thus, "[p]olice officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect."  *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011).  And "the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search."  *Id*. (internal quotation marks omitted).

The exigent circumstances rule is not rendered inapplicable, moreover, simply because "law enforcement officers who are not armed with a warrant knock on a door . . . [as] any private citizen might do."  *Id*. at 1862.  Officers may not gain entry by actually violating or threatening to violate the Fourth Amendment.  *Id*.  It is not a violation of the Fourth Amendment, however, for officers to knock on a door as any private citizen might.  If those on the other

side of the door react in ways that result in exigencies to which police must respond, occupants "have only themselves to blame for the warrantless exigent-circumstances search that may ensue." *Id.*

We employ an objective test in deciding whether an exigency justified a warrantless intrusion on Fourth Amendment interests, one "that turns on [an] examination of the totality of circumstances confronting law enforcement agents in the particular case." *MacDonald*, 916 F.2d at 769. We have often referred to six factors as guideposts for determining the existence of exigent circumstances:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Id.* at 769-70 (omission in original and internal quotation marks omitted); *see also United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995) (noting that in addition to the *MacDonald* factors, "federal courts, including our own, have considered [an additional factor, namely whether] quick action is necessary to prevent the destruction of evidence"). These factors are not germane in every

exigent circumstances situation, however,[11] and we have thus emphasized that they "are merely illustrative, not exhaustive, and [that] the presence or absence of any one factor is not conclusive." *Gordils*, 982 F.2d at 69 (internal quotation marks omitted). "The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action." *Klump*, 536 F.3d at 117-18 (citation and internal quotation marks omitted).

Based on these principles, we conclude that the district court's determination that exigent circumstances justified the agents' entry into Marin's motel room was not erroneous, much less clearly so.

Given the detailed information from Walsh, which the district court found to be reliable, as well as the ample corroboration of this information by the agents' observations at the scene, the agents clearly had probable cause to believe that Marin was a drug courier and in possession of over a kilogram of heroin.[12] Based on his covert monitoring of a phone belonging to a member of

---

[11] Consider, for instance, those cases in which officers enter private premises not in pursuit of a suspect, but to render aid. *See, e.g., Klump*, 536 F.3d at 118 (concluding that exigent circumstances justified warrantless entry into warehouse to investigate the cause of an odor indicative of a possible fire).

[12] Before the district court, Marin moved to suppress the evidence found in her motel room on the additional ground that the agents lacked probable

the drug smuggling organization, Walsh provided not only a description of the courier, but specific information as to where she would be found, and when the drug transaction was to occur.  Marin not only fit the description but was observed entering the very motel room in which the heroin delivery was to take place on the very day of delivery.  Moreover, the agents observed Marin repeatedly enter and exit Room 166 and survey the parking lot -- behavior that added to their probable cause to believe that Marin was about to engage in a drug transaction, as Marin appeared to be awaiting the arrival of another individual, engaging in precisely the conduct one might expect of a drug courier seeking to consummate a delivery.  *See United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992) (noting that observations of defendant "pac[ing] back and forth . . . and attempt[ing] to peer through [a car's] darkened windows" supported "probable cause to believe that [he] was a knowing participant in [a planned] drug pickup").

The agents' probable cause was yet again strengthened, as the district court found, when Marin "suddenly and forcefully attempted to slam her door

cause to arrest her.  The district court rejected this argument, *see Marin Moreno*, 2009 WL 454548, at *6, and Marin does not contest the court's probable cause ruling on appeal.  Probable cause to believe a suspect has committed a serious crime, as already indicated, weighs in favor of a finding of exigency in the circumstances here.  *See MacDonald*, 916 F.2d at 769.

closed upon seeing Agent O'Connor standing outside her room." *Marin Moreno*, 2009 WL 454548, at *6. As we have recognized, a hasty retreat into one's home on sight of police manifests guilt and may, in appropriate circumstances, transform suspicion into probable cause. *See United States v. Martinez-Gonzalez*, 686 F.2d 93, 99 (2d Cir. 1982) (finding probable cause where suspect "looked frightened and ran back into the apartment" in response to agents' identifying themselves as police). "[D]eliberatively furtive actions and flight at the approach of strangers or law officers," as the Supreme Court has said, "are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." *Sibron v. State of New York*, 392 U.S. 40, 66-67 (1968); s*ee also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that "nervous, evasive behavior" and "[h]eadlong flight -- wherever it occurs" are "not necessarily indicative of wrongdoing, but [are] certainly suggestive of such").

Marin's reaction to seeing O'Connor at her door, moreover, also created an urgent need to enter Room 166 to ensure that evidence was not destroyed. Marin's unusual behavior -- "suddenly and forcefully" attempting to slam shut a door she had just opened  -- raised a legitimate concern that she would

attempt to destroy or discard the drugs that the agents had probable cause to believe were inside.  *See King*, 131 S. Ct. at 1857 (noting that evidence destruction is frequent in drug cases "because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain"); *see also United States v. Atherton*, 936 F.2d 728, 732-33 (2d Cir. 1991) (noting that "we have repeatedly upheld warrantless entries where law enforcement officers reasonably believed that immediate access to the premises was necessary to prevent loss of evidence" and collecting cases).  This rendered Agent O'Connor's entry reasonable for Fourth Amendment purposes.

Marin argues that the district court erred in finding an exigency here because she believed that Agent O'Connor was a robber, not a DEA agent, and thus Marin had no incentive to destroy her drugs.  Marin further contends that even if she realized the true identity of the officers, the Supreme Court's decision in *King* makes clear that an "occupant['s] mere knowledge of the presence of agents or police outside, without more, is insufficient to create exigent circumstances warranting the officers' entry into the home."  Marin Reply Br. at 12.  These arguments are unavailing.

First, Marin did not testify at the suppression hearing and did not claim, either on the day of her arrest or before the district court, that she

23

believed Agent O'Connor -- attired as she was, in a white golf shirt and green capri slacks -- was at Marin's door to effect a daytime robbery. Moreover, we find no clear error in the district court's determination that Marin continued to resist O'Connor's efforts to calm her, even after O'Connor identified herself as "police" -- a finding in some tension with Marin's claim. In any event, even assuming, *arguendo*, that Marin believed Agent O'Connor was a robber when Marin attempted to slam the door, this fact makes no difference to the propriety of the agents' entry. The Supreme Court has made clear that "[a]n action [by law enforcement agents] is 'reasonable' under the Fourth Amendment . . . as long as the circumstances, viewed *objectively*, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (last alteration in original and internal quotation marks omitted).[13] In light of Marin's behavior and the surrounding circumstances -- which would not have led a reasonable officer to conclude that Marin believed robbers were at her door -- we find no clear error in the district court's conclusion that a reasonable, experienced

---

[13] For this reason, Agent O'Connor's stray remark at the suppression hearing that Marin, after being subdued, "calmed down and she realized, I think, that we were the police and not there to rob her" also makes no difference to the inquiry. O'Connor's subjective belief as to Marin's state of mind (whatever it might have been) is not germane to the question whether an exigency existed. *See id.*; *see also Klump*, 536 F.3d at 119 ("[A]gents' subjective motives [for effecting a warrantless search] simply do not matter.").

24

officer would have recognized an urgent need to take action, regardless of Marin's undisclosed reasons for her conduct.

Similarly (and contrary to Marin's claim), the district court's exigency finding is not inconsistent with the recognition in *King* that when police without a warrant knock on an individual's door, that person "need not allow the officers to enter the premises and may refuse to answer any questions at any time." *King*, 131 S. Ct. at 1862. To be clear, police may not knock on a door and then "cry exigent circumstances whenever probable cause exists that readily disposable drugs are in the home -- no matter what the response of the resident happens to be." *United States v. Chambers*, 395 F.3d 563, 576 (6th Cir. 2005) (Sutton, *J.*, dissenting). But as Judge Sutton recognized in *Chambers* -- and as the Supreme Court reaffirmed in *King* -- where the resident's reaction to the appearance of officers is "the verbal, visual or aural equivalent of 'The police are here, destroy the drugs,'" the traditional rules governing the exigent circumstances exception render entry reasonable. *Id*. at 577. Here, Marin did not simply refuse entry by the agents. Rather, as the district court found, she attempted "suddenly and forcefully" to slam the door in Agent O'Connor's face and thereafter continued to struggle against her as Agent O'Connor announced she was from the police. *Marin Moreno*, 2009 WL

454548, at *6. Thus, contrary to Marin's claim, this is not a case involving an individual's "knowledge of the presence of agents . . . without more." Marin Reply Br. at 12.

Attempting to avoid this conclusion, Marin cites the Eighth Circuit's decision in *United States v. Ramirez*, 676 F.3d 755 (8th Cir. 2012), which reversed a district court's finding that exigent circumstances justified officers' warrantless entry into a hotel room. The officers in *Ramirez*, however, first attempted, without any evidence of exigency whatsoever, to enter the defendant's room with a key card, and then forced entry when the defendant "attempt[ed] to shut the door" on their announcement they were police. *Id*. at 762. "[W]ithout more," the Eighth Circuit concluded, merely shutting the door "[did] not bolster the claim that it was reasonable to conclude that the destruction of evidence was imminent." *Id*. But *Ramirez* is simply inapposite here. When the agents knocked on Marin's door, they had probable cause to believe she was at that moment or would imminently be delivering a kilogram of heroin within the room. Marin responded to police, not by declining to speak, but by "suddenly and forcefully attempt[ing] to slam her door closed upon seeing Agent O'Connor standing outside her room," *Marin Moreno*, 2009 WL 454548, at *6 -- thus creating a circumstance in which *any* reasonable,

26

experienced officer would see "an urgent need to . . . take action." *Klump*, 536 F.3d at 117-18.

In sum, we are not left with the definite and firm conviction that the district court erred in determining that exigent circumstances justified the warrantless entry into Marin's motel room. Indeed, we see no error, much less clear error, in the district court's conclusion as to exigency. Accordingly, we reject Marin's claim that the evidence seized from Room 166 should have been suppressed as the tainted fruit of an unlawful entry.


*2. Consent*

Marin next contends that even assuming the warrantless entry into Room 166 was justified by exigent circumstances, the heroin concealed in her bags should still have been suppressed because her consent to search was not voluntary. "The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker," *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988), as opposed to "mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993). Voluntariness "is a question of fact to be determined from all of the surrounding circumstances." *Arango-Correa*, 851 F.2d at 57. In

27

considering Marin's challenge, we view the evidence in the light most favorable to the government and "will not reverse a finding of voluntary consent except for clear error." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). We find no such error here.

Marin argues that, in light of the forcible entry into her motel room by armed agents who both subdued and handcuffed her, failing thereafter to inform her that she was not required to consent, her oral and written consent to search could not reasonably be deemed voluntary. To be sure, these factors are germane to the voluntariness inquiry. In the totality of *all* the circumstances, however, we see no basis for concluding that the district court clearly erred in its consideration of them.

We have repeatedly observed that neither the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness. *See id.*; *accord Ansaldi,* 372 F.3d at 129 (holding that handcuffing and display of guns by five or six officers to effectuate arrest did not render consent to search involuntary)*; United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) ("[A] finding of coercion [does not] follow from the fact that [the defendant] was handcuffed."); *Arango-Correa*, 851 F.2d at 57-58 (noting that "[t]he fact that [the defendant] was in custody for five hours did

not compel a finding that his consent was involuntary"). Here, sufficient time elapsed between the agents' initial entry into Marin's room and her consent to search for Marin to calm down after her initial, brief struggle with O'Connor and Samilo. Indeed, it is undisputed from the record that Marin was calm when agents asked her consent to search. Moreover, Marin did not allege before the district court "that the agents used intimidating or coercive language or gestures" in seeking her consent. Granted, agents did not explicitly advise her that she could decline. "While knowledge of the right to refuse consent is one factor to be taken into account," however, "the government need not establish such knowledge as the *sine qua non* of an effective consent." *United States v. Drayton*, 536 U.S. 194, 206-07 (2002) (internal quotation marks omitted); *see also Ansaldi*, 372 F.3d at 129-30 (finding valid consent where defendant had been subjected to use of force, was handcuffed, and was asked by agents "'Do you mind if we search?'" and defendant responded "'Sure, go ahead'"). Knowledge of the right to refuse, as we have said, "is not a requirement to a finding of voluntariness." *Garcia*, 56 F.3d at 422.

Here, Marin did not hesitate when the agents requested her consent but immediately gave them permission to search her bags, volunteering that the

bags had already been searched at the airport. Marin may have hoped to dissuade the officers from searching with this information, or she may have been confident that the heroin, secreted in carefully constructed perfume canisters, would be overlooked, given that it had not been found before. At any rate, the district court did not clearly err in considering that Marin's ready acquiescence to the agents' first request and her volunteered information that her bags had already been searched weighed against the claim that "her free will was overcome." *Marin Moreno*, 2009 WL 454548, at *7.

Marin points, finally, to the absence of *Miranda* warnings and to Agent O'Connor's statement to her that "if there's something here that you want to tell us or if there's something here that shouldn't be here it's in your best interest to tell us now while you can before we find it on our own." She argues that these factors strongly militate against the district court's conclusion that her consent was not coerced. *Miranda* warnings, however, are not a prerequisite to obtaining a valid consent to search. *See United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) (finding unpersuasive "[t]he argument that *Miranda* warnings are a prerequisite to an effective consent to search"). And although Marin argues that O'Connor's statement effectively

communicated "that refusing to consent would be futile, and such statements are . . . inherently coercive," the district court's factual findings are to the contrary.

Agent Aceves carefully explained to Marin that the agents were seeking her consent. In the district court's words, "[a]fter providing a written Spanish translation of the [consent] form to the defendant, and reading the form to her in Spanish, Agent Aceves asked her if she understood the form, and she replied that she did." *Marin Moreno*, 2009 WL 454548, at *3. These actions clearly communicated that Marin's consent mattered -- so that the agents did not intend then and there to conduct a search regardless of her response.[14] And as Agent Aceves testified, when Marin was asked for consent to search, "[s]he agreed," and agreed immediately.

In sum, we find no clear error in the district court's holding that Marin's consent to search her motel room was voluntarily given. Marin provided oral consent without hesitation. She was then provided with a consent form that expressly noted she had been *asked* to permit a search of her luggage and room; that affirmed she had not been threatened or forced in any way; and

---

[14] Agent Aceves testified that, pursuant to DEA procedure, if Marin had refused consent, the agents would have sought a search warrant -- a warrant for which they clearly had probable cause.

that concluded by stating that she freely consented. This form was not only provided to her in writing, but was also read to her aloud. Marin affirmed that she understood the form and she signed it without pause. As the district court found, the atmosphere of the encounter between the agents and Marin was not unduly hostile, and Marin has not alleged that the agents acted in an intimidating or coercive manner in eliciting her consent. There is simply no basis on this record to conclude that the district court clearly erred in holding that Marin's consent was voluntary.

## CONCLUSION

We find no clear error in the district court's ruling that the agents' warrantless entry into Marin's motel room was justified by exigent circumstances. We similarly conclude that the district court did not clearly err in determining that Marin's consent to search her motel room and her luggage was voluntarily given. We have considered all of Marin's remaining arguments and have rejected them as without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

SUSAN L. CARNEY, *Circuit Judge*, concurring:

The majority has conducted a careful analysis in a difficult and highly fact-specific case. Nonetheless, I find that I cannot join it in concluding that there was no clear error in the district court's ruling that exigent circumstances justified the agents' warrantless entry into Marin's motel room. Because I do join, however, in the majority's determination that Marin's consent to search was voluntary, and because I conclude that the taint created by the unlawful entry was dissipated, I concur in the majority's decision to affirm the judgment of the district court.

The "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable," <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006), applies equally to warrantless searches of a motel room, <u>see</u> <u>Stoner v. California</u>, 376 U.S. 483, 490 (1964). A warrantless search that is supported by both probable cause and exigent circumstances will overcome the presumption of unreasonableness. <u>See</u> <u>Kirk v. Louisiana</u>, 536 U.S. 635, 638 (2002) (per curiam). Although exigency in "the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search," <u>Kentucky v. King</u>, 131 S. Ct. 1849, 1856 (2011), the government bears "a heavy burden" when attempting to demonstrate that such circumstances were present when the search took place, <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749-50 (1984).

The majority here concludes that Marin's attempt to slam her motel room door upon seeing O'Connor created an urgent need for the agents to enter the room to ensure that Marin would not dispose of the drugs that the agents had probable

cause to believe were inside. I agree the agents had probable cause to believe that Marin was a drug courier in possession of over a kilogram of heroin.[1] I also agree that Marin's actions upon seeing, unexpectedly, O'Connor standing with the chambermaid informs our analysis of whether an exigency existed. I am troubled, however, that the majority's finding of exigency ultimately appears to turn on the speed and force with which Marin attempted to close her door when she saw O'Connor, an un-uniformed stranger, standing there.

As the majority notes, "[t]he core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to . . . take action." United States v. Klump, 536 F.3d 113, 117-18 (2d Cir. 2008). As I see it, the determinative "moment of entry" in this case occurred when O'Connor "put [her] hand up to block" Marin from closing the door. Tr. of Suppression Hr'g at 96:3-4; see also Maj. Op. at 8. As the Supreme Court recently cautioned in Kentucky v. King, however, even if an occupant has opened the door to law enforcement officers, that "occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." 131 S.Ct. at 1862. When the housekeeper knocked and Marin began to open the door, Marin had no obligation to speak to O'Connor; nor was she required to allow O'Connor to enter her room.

---

[1] Probable cause alone, of course, does not establish exigency. See Welsh, 466 U.S. at 753 (recognizing that "no exigency is created simply because there is probable cause to believe that a serious crime has been committed").

2

What, then, were the exigent circumstances that justified the agents'

warrantless entry as Marin shut the door?  The majority asserts that Marin created

an exigency by "suddenly and forcefully attempting to slam shut a door she had just

opened."  Maj. Op. at 22 (internal quotation marks omitted).  It characterizes

Marin's actions as "the verbal, visual, or aural equivalent of 'The Police are here,

destroy the drugs.'"  Maj. Op. at 25 (quoting United States v. Chambers, 395 F.3d

563, 577 (6th Cir. 2005) (Sutton, J., dissenting)).

With respect, I disagree.  Under Kentucky v. King, as one of our sister

circuits has held, a hotel guest like Marin was "within [her] bounds in [her] attempt

to close the door" on O'Connor and the chambermaid.  United States v. Ramirez,

676 F.3d 755, 762 (8th Cir. 2012) (discussing Kentucky v. King and making

alternative finding that suspect's attempt to close hotel door on officers waiting

outside was insufficient to establish exigent circumstances justifying warrantless

entry).  "That [she] did so, without more, does not bolster the claim that it was

reasonable to conclude that the destruction of evidence was imminent."  Ramirez,

676 F.3d at 762.  I am concerned that the majority's rationale here could be invoked

"whenever probable cause exists that readily disposable drugs are in the home" and

a defendant acts in an abrupt or uncivil manner in denying entry to law

enforcement officers.  Chambers, 395 F.3d at 576 (Sutton, J., dissenting).

Further, I question whether the circumstances in this case, as they appeared

when O'Connor forcibly entered Marin's room, provided an objectively reasonable

basis for believing that Marin understood the stranger at her door to be a law

3

enforcement agent. If not, it is difficult to interpret Marin's closing the door with force as signaling her resistance to the police and foretelling an attempt to destroy evidence. Indeed, O'Connor was dressed in plain clothes – an untucked short-sleeved white golf shirt and green capri slacks. When Marin attempted to slam the door, O'Connor had not identified herself as "police." And although O'Connor wore a two-and-one-half inch gold badge on her hip, there was no testimony to suggest that Marin had looked down toward the badge or that the badge was even visible given the position of the parties and the matter of seconds between when Marin opened the door and when she attempted to close it.[2] For these reasons, I harbor serious doubts that exigent circumstances justified the agents' warrantless entry, and I believe the district court clearly erred in its analysis concluding to the contrary.

Despite my departure from its reasoning on the lawfulness of the entry, I join in the majority's result because I conclude that the government has shown that Marin's subsequent consent to search the room was both voluntary and also "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Brown v. Illinois, 422 U.S. 590, 599 (1975).

We have observed that "[w]hen a consent to search follows an illegal entry," the government must "show more than the voluntariness of the consent; it must also demonstrate that the taint of the initial entry has been dissipated in order to

---

[2] The record does not reflect whether the housekeeper was standing next to or in front of O'Connor or whether O'Connor's untucked shirt obscured her badge from view.

4

admit evidence seized following the illegal entry." United States v. Snype, 441 F.3d 119, 132 (2d Cir. 2006). For the reasons set forth by the majority, I find no clear error in the district court's ruling that Marin's consent to search her motel room was voluntarily given. The separate but overlapping taint inquiry, which (in light of its ruling on the alleged exigency) the district court did not reach, presents a more difficult question.

In assessing "whether the taint of [an] illegal entry was sufficiently diminished, we consider four factors: whether a Miranda warning was given, the 'temporal proximity' of the illegal entry and the alleged consent, 'the presence of intervening circumstances,' and 'the purpose and flagrancy of the official misconduct.'" United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (quoting Brown, 422 U.S. at 603-04). Here, the record reveals the following.

First, Marin did not receive a Miranda warning in the interim between the entry and the search of her suitcases, and the record provides no reason for the omission.[3] The rights secured by Miranda were not fully explained through the consent form. But second, approximately fifteen minutes had elapsed between the very brief, tumultuous entry and Marin's consent to search. The record reflects that during this interlude Marin had "calmed down." Tr. of Suppression Hrg. at 35:20. Although handcuffed, she engaged in conversation in Spanish with Agent Aceves during this time. Marin Moreno, 2009 WL 454548, at *3. Third, when Aceves

---

[3] In addition, O'Connor told Marin that "if there's something here that you want to tell us or if there's something here that shouldn't be here it's in your best interest to tell us now while you can before we find it on our own." Tr. of Suppression Hrg. at 104:12-15; Maj. Op. at 30.

5

requested Marin's consent to search the room, she "agreed immediately." Tr. of Suppression Hr'g at 36:7. In addition, she told the agents that she had been searched by customs officials upon her arrival at the airport that morning – implying, it seems, that she was not concerned that the agents would find any item of consequence, and underscoring the voluntariness of her consent. Tr. of Suppression Hr'g at 36:9-10. And, after Aceves translated its contents into Spanish for her, line by line, and wrote the Spanish version out for her on the forms, Marin agreed to and did sign a printed consent to search. The form stated, *inter alia*, "I have not been threatened, nor forced in any way," and "I freely consent to this search." Suppression Hr'g, Gvt. Ex. 1. Finally, our panel has been directed to no evidence suggesting that the agents' conduct in entering or searching was "flagrantly illegal or fraught with evil purpose." Oguns, 921 F.2d at 448.

Although the question is close, I conclude that these circumstances, particularly Marin's comment about her earlier uneventful passage through customs, sufficed to "sever the causal connection between [the] entry and [the] subsequent consent to search." Snype, 441 F.3d at 135; cf. id. (finding dissipation of taint where "intervening events," including the defendant's written consent to search, "effectively replaced the fearful atmosphere of the initial forcible entry with relative calm").

I therefore concur in the majority's affirmance of the district court's judgment.

6