12-43550-cv
Glen Harris v. JohnMichael O'Hare et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: December 11, 2013                    Decided:   October 30, 2014

Amended: November 24, 2014)

Docket No. 12-4350-cv

_____

GLEN HARRIS, individually, and PPA as guardian for K.H., a minor child,

*Plaintiffs-Appellants*

v.

JOHNMICHAEL O'HARE; ANTHONY PIA; and CITY OF HARTFORD,

*Defendants-Appellees*.

_____

Before: POOLER, PARKER, and WESLEY, *Circuit Judges*.

Appeal from a September 27, 2012 order and judgment, entered September

28, 2012, of the United States District Court for the District of Connecticut (Robert

N. Chatigny, *J.*) denying Plaintiffs' motions for judgment as a matter of law and

new trial, brought pursuant to Federal Rules of Civil Procedure 50 and 59. We conclude that there was insufficient evidence to support the jury's finding of exigent circumstances, and thus that the district court erred in denying Plaintiffs' post-trial motions. We therefore reverse the judgment, and remand the matter to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

_____

JON. L. SCHOENHORN, Jon L. Schoenhorn & Associates, Hartford, CT, *for Plaintiffs-Appellants*.

THOMAS R. GERARDE, Howd & Ludorf, LLC, Hartford, CT (Alan R. Dembiczak, on the brief), *for Defendants-Appellees JohnMichael O'Hare and Anthony Pia*.

NATHALIE FEOLA-GUERRIERI, Assistant Corporation Counsel, Hartford, CT, *for Defendant-Appellee City of Hartford*.

POOLER, *Circuit Judge*:

Glenn Harris and his daughter K.H. (together, "Plaintiffs") filed suit in 2008 against the City of Hartford and Hartford Police Officers JohnMichael O'Hare and Anthony Pia (together, "Defendants"), for damages stemming from the officers' warrantless entry onto Harris's property on December 20, 2006. After

entering the property, O'Hare shot and killed Seven, the family's pet Saint Bernard, at close range and within earshot, if not in front of, Harris's then-twelve-year-old daughter, K. During the entirety of the litigation leading up to trial, Defendants argued that there was no Fourth Amendment intrusion because the entry into the yard was not a Fourth Amendment search, that it was reasonable in any event, and that they were entitled to qualified immunity. The district court denied the parties' cross-motions for summary judgment in March 2010 and the parties submitted their Joint Trial Memoranda in January 2011. More than a year later, weeks before trial, Defendants filed an addition to their trial memorandum adding the affirmative defense of exigent circumstances as an exception to the Fourth Amendment's warrant requirement. Plaintiffs objected to this late-raised defense. The district court permitted it over objection, and the jury returned a verdict for Defendants.

For the reasons set out in this opinion, we hold that there was insufficient evidence to support a factual finding of exigent circumstances, and that this substantive error requires reversal of the judgment. We therefore reverse the judgment entered in favor of Defendants, and remand the matter for further proceedings consistent with this opinion.

BACKGROUND

During a six-day trial held in May 2012, the jury heard evidence concerning O'Hare and Pia's warrantless entry onto Plaintiffs' property following their receipt of a tip about guns being stashed in an abandoned Nissan Maxima. The officers entered the property at the same time that Harris's twelve-year-old daughter, K., had returned from school and was playing with her three-year-old Saint Bernard dog, Seven, in the backyard of the family's Hartford home. The following facts are taken from the testimony and other evidence presented at trial.

**I.    Relevant Factual Background**

**A.    Plaintiffs' Home on Enfield Street**

From 2006 to 2007, Plaintiffs lived in a single-family home at 297 Enfield Street. Their home was surrounded entirely by a chain link fence. In December 2006, Harris lived there with his daughter K., Tashonna Ayers, who was Harris's girlfriend and K.'s stepmother, and two pet Saint Bernards, Seven and Deuce.

The house had a front yard and backyard, which the family used for cookouts, playing with the dogs and hanging out together and with friends. During the summer, Plaintiffs would have pool parties and water fights with a

blow-up pool they set up. There is a front gate which remains closed with a latch. The gate opens onto a walkway leading up to the front steps and front door. On the front of the house is a "Beware of Dog" sign.

Harris testified that during his ownership of the property, there were no utility meters that would require utility personnel to enter the property. Further, when water company personnel needed to enter the property to place a water meter in the north side yard, they obtained his permission before they entered onto his property.

K. testified that when she played with her dogs in the yard, they would run all around the fenced-in periphery of the house. When the dogs were playing with K. in the yard, she never needed to leash them. No one would ever come into the yard while K. was playing if they were not invited. At the relevant time in 2006, Harris had two cars, a dark SUV and a white pick-up truck that he drove to work each day.

**B.      The Officers' Gun Tip**

On December 20, 2006, Officers O'Hare and Pia were on duty in the vicinity of Enfield Street. Both were part of the "Northeast Conditions Unit," which had its officers under orders to "get as many guns off the street as [they]

could." Trial Tr. Vol. I at 140. Then-Officer Gabriel Laureano, who is not a party in this action, was also on duty that day, specifically a few streets over on Garden Street. While patrolling with O'Hare, Laureano saw George Hemingway, a high-ranking member of the West Hell Gang,[1] whom Laureano knew to have been recently released on parole. Laureano noticed Hemingway drop "something" that "looked like little plastic sleeves" very discretely, which appeared to Laureano to be heroin or another type of drug. *Id.* at 64. This substance was later confirmed to be heroin. *Id.* Laureano and O'Hare placed Hemingway under arrest, handcuffed him, and put him in the back of the patrol car. Later that evening, Laureano filled out an application for an arrest warrant.

Hemingway, while alone in the car with Laureano and knowing "he was in a bind" because he had been arrested with drugs while out on parole, told Laureano that "he could get [them] some guns." *Id.* at 68. Laureano understood Hemingway to be hoping for some sort of "consideration" from a prosecutor in light of this arrest, and permitted Hemingway to make a call on his cell phone, during which time Laureano recalled Hemingway "was sweating and . . . was

---

[1]The West Hell Gang was known to the officers as a violent street gang of fifteen- to twenty-year-olds, and many of its members were suspects in shootings throughout Hartford.

kind of frantic about figuring out where" the guns could be located. *Id.* at 147.

Specifically, Hemingway informed Laureano that there were two small caliber guns stashed under the driver's seat of an abandoned grey Nissan Maxima in the rear yard of 297 Enfield Street. Hemingway did not tell Laureano how he knew about the guns.

Laureano had never used Hemingway as an informant before. Neither had O'Hare or Pia. Armed with Hemingway's tip, Laureano "informed Officers O'Hare and Pia to go check out the information." *Id.* at 76; *see also* Application for Arrest Warrant at 2. Officer Pia could not recall the route that he and O'Hare took to Enfield Street, but they headed over immediately, without a warrant and without informing their sergeant of what they were doing.

**C. The Encounter at 297 Enfield Street**

Proceeding without a warrant, Pia and O'Hare entered the front gate at 297 Enfield Street. The officers did not go up to the front door to knock and explain their presence, nor did they look to the front door, or notice the "Beware of Dog" sign. They did not look to see if a grey Nissan Maxima was parked in the driveway. They also did not drive on a parallel street to check if they could see anything in the backyard from the street. Once they entered the property, the

7

officers did not see any abandoned vehicles. In fact, although it is undisputed that Harris's SUV was in the driveway at the time, O'Hare testified that he did not recall seeing any vehicles on the property.

As Pia and O'Hare began walking along the side of the house toward the rear yard, both of the officers had their service weapons out in a "tactical low ready approach," which O'Hare explained was a two-handed grip, Trial Tr. Vol. III at 620. Pia recalled seeing the dog towards the rear corner of the side yard, as he peeked into the back yard. Pia saw the dog take a few steps towards him. O'Hare yelled to Pia to run, and Pia turned around and ran until he exited the yard. O'Hare heard the dog growl, and believed that the dog was chasing him. Rather than run out the way he had entered, O'Hare ran back across the front lawn, turning to face the dog as he continued to back up. O'Hare then fired three shots at the dog at point-blank range. After shooting the dog, O'Hare saw K.

K. had returned from school and had taken Seven outside, which was a regular after-school chore. K. testified that after Seven urinated against the back fence, he ran around towards the front of the house. K. went around the opposite way, "[t]o cut him off." *Id.* at 425. By the time she got to the area where her father's SUV was parked, K. heard two gunshots. K. ran to the front yard and she

8

saw a police officer, with his gun aimed at Seven, who was laying in the grass. K. screamed, and testified that the police officer shot Seven a third time in the head, in front of her.[2] Her stepmother ran outside upon hearing gunshots, saw O'Hare holding a gun next to Seven, Pia standing in the driveway, and K. on her knees over Seven, who was lying on his side on the lawn.

No Nissan Maxima was ever found on or anywhere near the premises, and no guns were ever recovered.

**II.**     **Proceedings Before the District Court**

Harris commenced suit in 2008 against O'Hare, Pia, and the City of Hartford for damages stemming from the entry onto his property on December 20, 2006, and the shooting and killing of Seven. Plaintiffs' complaint alleged eight counts: two constitutional claims brought pursuant to 42 U.S.C. § 1983 for (1) illegal search and seizure in violation of the Fourth Amendment, and (2) a Fourteenth Amendment substantive due process violation, as well as six state law claims for (3) a violation of the Connecticut State Constitution; (4) intentional

---

[2] There is no dispute that O'Hare fired three shots at Seven, though there is some dispute as to whether the third and final shot was fired directly in front of K. *See* Trial Tr. Vol. III at 683.

infliction of emotional distress; (5) trespass; (6) conversion; (7) negligence; and (8) indemnification against the City of Hartford.

Throughout the litigation, Defendants contended that there was no Fourth Amendment intrusion because the entry into the yard was not a Fourth Amendment search, that it was reasonable in any event, and that they were entitled to qualified immunity. The district court denied the parties' cross-motions for summary judgment in March 2010—including Defendants' motion asserting entitlement to summary judgment on the basis of qualified immunity. In January 2011, the parties submitted their Joint Trial Memoranda. There, too, Defendants maintained that their entry into Harris's yard was not a Fourth Amendment search, as it was not curtilage.

Weeks after the pretrial conference, and just before trial, Defendants filed an addition to their trial memorandum, which added the affirmative defenses of exigent circumstances and community caretaking as exceptions to the warrant requirement, and requested supplemental jury instructions on these defenses. Plaintiffs objected to these late-raised defenses as extremely prejudicial. The district court permitted evidence to be introduced at trial in contemplation of allowing these defenses over Plaintiffs' objection.

**A.      Inclusion of the Exigent Circumstances Defense**

At the close of evidence, and after both parties had moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, the district court asked defense counsel about "the state of the evidence with regard to the exigent circumstances exception." Trial Tr. Vol. III at 943-44. Defense counsel noted that there were "two categories of evidence," the first being the officers' general experience, which he conceded was only of limited relevance. *Id.* at 944. The second, which defense counsel called the "hardcore facts," were described as follows:

> [W]e had a man by the name of George Hemingway. . . . We know he was released from prison, on parole, caught with heroin, with a serious motive to try and help himself. We know that he said, I can find you some illegal guns. Guns is our business since the Northeast Conditions Unit started. They recover illegal guns all the time.  They ask for illegal guns all the time, and they make these quick recoveries once they get tips. . . . [T]hey get from Laureano there are two guns over in an abandoned vehicle with a particularized description of the home, it's 297 Enfield Street, the location in the home, in the rear yard, in a Nissan Maxima, under the front seat, and it's gray.

*Id.* at 944-45. Defense counsel concluded, "illegal guns that are unsecured are a present and immediate danger to the public and to the community." *Id.* at 946. He further offered that the officers "were not looking for any evidence to try and

11

arrest someone or to try and develop a case or whatever. . . . We were going onto that property to take two unsecured illegal guns out of the community and into destruction. No arrests, no nothing." *Id.* at 947.

**B.     Jury Instructions**

The jury was instructed that the Fourth Amendment's warrant requirement extends to the curtilage of a home—"an area immediately adjacent to the home in which the individual has a reasonable expectation of privacy because the area in question is like part of the home itself." Trial. Tr. Vol. V ("Jury Instructions") at 24. The jury was given a series of factors to consider in making its determination about whether the property in question was curtilage.

The jury was also instructed that even if the property in question was curtilage, they were to decide whether the warrantless entry was lawful under the exigent circumstances exception to the Fourth Amendment's warrant requirement. The district court charged the jury as follows:

> [U]nder the exception to the warrant requirement for exigent
> circumstances, conducting a warrantless search for contraband or
> evidence of a crime is justified if the police reasonably believe that
> unless they immediately conduct a warrantless search, the items in
> questions will be removed or destroyed.  A mere possibility that
> such items could be removed or destroyed is not sufficient; rather,
> for the exigent circumstances exception to apply, the officers must be

12

justified in reasonably believing that the items are in the process of being removed or destroyed or that removal or destruction of the items is imminent. Exigent circumstances justifying an immediate search may not be present if police have a reasonable opportunity to secure a residence to prevent destruction or removal of contraband or evidence while a search warrant is obtained.

Plaintiffs did not object to these instructions on the basis that they were legally incorrect. Rather, Plaintiffs asserted that the instruction should not have been given because there was no evidence to support the application of this exception. The district court overruled the Plaintiffs' objection in an off-the-record ruling. Over Defendants' objection, the jury was not charged on the community caretaking exception.

### C. Jury Verdict and Interrogatories

Following the six-day trial, the jury returned a verdict for Defendants on all counts. The district court then issued two special-verdict interrogatories to the jury, specifically on the issue of curtilage and exigent circumstances. The jury did not reach a conclusion on the issue of whether the "area of the property that the defendants entered was curtilage," but found that the exigent circumstances exception applied.

## D.     Post-Trial Motions

All parties filed post-trial motions. Harris and K. moved under Rules 50 and 59 of the Federal Rules of Civil Procedure on the basis that Defendants should not have been permitted to add exigency as a defense weeks before trial, and that there was insufficient evidence to support the jury's verdict on this ground. Defendants moved pursuant to Rule 50 on the basis that even notwithstanding the verdict, they were entitled to qualified immunity.

In a brief ruling, the district court denied Plaintiffs' post-trial motions, holding that the jury could reasonably conclude that the officers' entry was supported by probable cause and exigent circumstances. Dist. Ct. Dkt. ECF No. 129 ("Dist. Ct. Op.") at 4. With regard to exigent circumstances specifically, the court held that

> the jury could credit the officers' testimony that they had an urgent need to take action to seize the guns before a warrant could be obtained. The officers explained that in their experience, illegal guns moved quickly, and they did not expect the guns to be in the Maxima for long. The jury also could credit the officers' testimony that there was no reasonable alternative to entering the property to seize the guns, such as cordoning off the property while a warrant was obtained.

*Id.* at 4-5. The court also denied Harris's motion for a new trial, holding that the jury verdict was not against the weight of the evidence. *Id.* at 5. Having affirmed the jury verdict, the district court denied Defendants' qualified immunity motion as moot. *Id.*

**DISCUSSION**

On appeal, Harris and K. challenge the jury verdict and the district court's denial of their Rule 50 and Rule 59 motions on several grounds, all relevant to the Fourth Amendment claims. Plaintiffs assert: (1) that the issue of whether the property constituted 'curtilage' should not have been submitted to the jury because as a matter of law, the property in question is curtilage; (2) that it was error to permit the exigent circumstances defense so close to the commencement of trial, (3) that, as a matter of law, the evidence did not support a finding of probable cause and exigent circumstances, and (4) that the district court abused its discretion in permitting testimony about Defendants' understanding that Hartford was one of the most dangerous cities in America at the time of the officers' entry into Harris's yard. As a result of these errors, Plaintiffs argue that the remainder of the jury verdict cannot stand, because all counts of the

complaint relate to whether the entry and shooting were reasonable or unreasonable under the Fourth Amendment.

**I.    Standards of Review**

We review a district court's denial of a Rule 50 motion for judgment as a matter of law de novo. In doing so, we "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 93 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted).  We will reverse the judgment of the district court "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).

A denial of a Rule 59 motion for a new trial is reviewed for abuse of discretion, which occurs when (1) the "decision rests on an error of law . . . or a clearly erroneous factual finding," or (2) the "decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be

16

located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

Evidentiary rulings, such as permitting the testimony about Hartford's record as a violent city, are reviewed for abuse of discretion. *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011).

**II.   Analysis**

**A.   Fourth Amendment Warrantless Searches**

"The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *United States v. Simmons*, 661 F.3d 151, 156-57 (2d Cir. 2011) (citing *Kentucky v. King*, —— U.S. ——, 131 S.Ct. 1849, 1856 (2011) ("It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." (internal quotation marks and citation omitted)). As relevant to this case, "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

### 1. Curtilage

We first address the question of curtilage, a concept which "originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). Plaintiffs maintain that the question of whether the property constituted curtilage should not have been submitted to the jury, and that instead the district court should have instructed the jury that curtilage was established as a matter of law.

We need not address this argument because Plaintiffs suffered no harm from the error they contest. As indicated in the special interrogatories, the jury did not decide whether the area in question constituted curtilage, but focused directly on whether the officers' intrusion into that area was excused by exigent circumstances. Because the district court instructed the jury only to consider the exigent circumstances defense if it found the area in question was curtilage, this case was decided on the jury's apparent presumption that Defendants could escape liability only if they succeeded in establishing their affirmative defense, which assumes *sub silencio* that the side yard of 297 Enfield Street was curtilage and therefore subject to the warrant requirement. Moreover, when the district

18

court affirmed the jury verdict on the basis that sufficient evidence existed to support the finding of exigent circumstances and probable cause, it reinforced the jury's implicit conclusion that the officers had encroached on the curtilage of Plaintiffs' home.

### 2. Probable Cause

We address whether the officers had probable cause to proceed with investigating Hemingway's tip, which is the first requirement for a warrantless search on the basis of exigent circumstances. *Kirk*, 536 U.S. at 638. Plaintiffs contend that as a matter of law, there was insufficient evidence to support a finding of probable cause here. We disagree, and affirm the district court with respect to its denial of Plaintiffs' Rule 50 and 59 motions on the basis of probable cause.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Informants' tips, like all other clues and evidence coming to a policeman

19

on the scene may vary greatly in their value and reliability." *Id.* (internal quotations omitted).

In rejecting Harris's post-trial motion for judgment as a matter of law, the district court concluded that under the "practical, nontechnical conception" of probable cause described by the Supreme Court, "the jury could credit the experienced officers' testimony that Hemingway's tip provided probable cause that two guns would be found at this location." Dist. Ct. Op. at 4. The district court also highlighted that Hemingway's tip was "reasonably detailed." *Id.* at 2.

We agree with the district court's ruling on the issue of probable cause. The jury had evidence that on the day in question, the police officers identified Hemingway as a "high level member of the West Hell Gang," which Officer Laureano described as a "[v]iolent street gang" comprised of teenagers and some twenty-year-olds that committed homicides in the neighborhood. Trial Tr. Vol. I at 142. He testified further that "[w]e were constantly going there for shots fired. And a lot of [West Hell] members themselves were suspects in shootings all over the city." *Id.* at 142-43. On the day of the incident, Laureano and Defendant O'Hare had caught Hemingway with eight bags of heroin, and they knew that Hemingway had recently been released from prison and was on parole from a

20

prior gun conviction. Laureano testified that, once caught, Hemingway "started volunteering information . . . that he knew where guns were, he could get us guns." Trial Tr. Vol. I at 144. Hemingway described in detail where the guns would be found—under the front seat of an abandoned Nissan Maxima in the rear yard of 297 Enfield Street.

When asked why Laureano found Hemingway reliable, Laureano explained:

> He's reliable in the sense where he's a known gang member who based on our intelligence was a high ranking, if not the leader. His friends had been arrested with guns, he had a prior gun conviction, we were responding over there on a daily basis for gunshots, people shot. And so when it came to guns, in my eyes, he was very reliable.

*Id.* at 76-77. Pia testified that Hemingway was "an active gang member. He was a member of West Hell, a leader. He had the power, he had the authority and the access to firearms. So in his area, in that context, he was reliable to us." Trial Tr. Vol. II at 366. O'Hare explained further, "Hemingway was now in a position of self preservation. It would be detrimental to him to provide us false information. . . . At that point he was looking for consideration. . . . And this was common practice we employed at the time to recover most of our illegal firearms." Trial Tr. Vol. III at 679.

21

At this stage of the proceedings, this Court is not permitted to substitute its own view of what weight, if any, to give to Hemingway's tip. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 15051 (2000) (on review of a Rule 50 motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" (citations omitted)). There is evidence in the record to support the jury's inference that the officers believed that Hemingway's legal predicament (he had just been arrested with eight bags of heroin close to a school, while on parole for a prior gun conviction) made him more likely to tell the truth about a gun tip, in order to help himself in whatever way he could. Further, the officers testified that, in the past, they had successfully procured illegal guns by securing tips from gang members against other gang members. As such, there was sufficient evidence to support the jury's finding of probable cause to act on Hemingway's tip. We therefore affirm the district court with respect to its denial of Harris's Rule 50 and 59 motions on this basis.

### 3. Exigent Circumstances

Though we hold that there was sufficient evidence to support the jury's finding on probable cause, we do not reach the same conclusion with respect to exigent circumstances.

"The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *Loria v. Gorman*, 306 F.3d 1271, 1284-85 (2d Cir. 2002) (alteration and internal quotation marks omitted). "In answering that question, we must be cognizant of the Supreme Court's admonition that 'exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.'" *Id.* (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (quotation marks and citation omitted)).

There was simply insufficient evidence to warrant the application of the exigent circumstances exception here. In *Ruggiero v. Krzeminksi*, we explained, in a similar Fourth Amendment context, that the presumption of unreasonableness attached to warrantless searches "may cast upon the defendant the duty of

23

producing evidence of . . . exceptions to the warrant requirement."[3] 928 F.2d 558, 563 (2d Cir. 1991). In the face of patently insufficient evidence to support the defense, the district court erred first by allowing the exigent circumstances question to go to the jury, and second, in denying Plaintiffs' post-trial motions.[4]

### a. Legal Standards for Exigent Circumstances

Recognizing that "the warrant requirement is subject to certain reasonable exceptions," *King*, 131 S. Ct. at 1856, we employ an objective test in deciding whether a claimed exigency justifies a warrantless intrusion on Fourth Amendment interests. The objective test "turns on [an] . . . examination of the totality of circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990).

---

[3] Of course, as in all civil cases, "the ultimate risk of non-persuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials." *Ruggiero*, 928 F.2d at 563; *see also* Fed. R. Evid. 301.

[4] Plaintiffs argue that the district court should not have permitted instructions on exigency in the first place, because Defendants failed to raise the defense at earlier stages in the litigation. Because we conclude that there was insufficient evidence to support a finding of exigent circumstances, and that reversal is therefore warranted, we need not consider Plaintiffs' argument that they were prejudiced by Defendants' strategic decision to raise the affirmative defense so close to the start of trial.

We have often referred to six factors, adopted from the D.C. Circuit opinion in *United States v. Dorman*, 435 F.2d 385, 391 (D.C. Cir. 1970), as guideposts for determining whether exigent circumstances are present:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 2797 (2013) (citing *MacDonald*, 916 F.2d at 769-70 (omission in original and internal quotation marks omitted)).

Defendants concede that these factors "although informative, are not directly applicable to recovery of property scenarios because there is no specific suspect of interest to the law enforcement defendants." As relevant here, "federal courts, including our own, have considered an additional factor, namely whether quick action is necessary to prevent the destruction of evidence." *Moreno*, 701 F.3d at 73 (alteration omitted) (citing *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995)); *see also King*, 131 S.Ct. at 1856 ("[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a

25

warrantless search." (internal quotation marks omitted)). Defendants claim only this last factor—that there was a need to prevent the imminent removal of the illegal guns—as justification for their entry into Harris's yard.

                    b.       The Evidence Adduced at Trial Permits No Reasonable Inference of Urgency

O'Hare stated that, on the day in question, the officers' purpose was to retrieve the two firearms from the Nissan Maxima before anyone else could get to them, and that the officers made a "tactical approach" onto Harris's property "due to the fact we're in a high crime neighborhood." Trial Tr. Vol. III at 682. O'Hare also noted that "[he] wasn't sure if this would be an ambush." *Id.*

Though genuinely held, the officers' concerns about getting illegal guns off of the streets of Hartford are not pertinent to an exigency analysis. This is because testimony about how fast "guns move" in Hartford, or about the violent gangs in that part of the city, are not specific facts or evidence particular to this case. Rather, they are generalized facts about the city and about the nature of gun trafficking. Such general knowledge, without more, cannot support a finding of exigency. The exigency inquiry "turns on the district court's examination of the

totality of circumstances confronting law enforcement agents *in the particular case.*" *MacDonald*, 916 F.2d at 769 (emphasis added).

In determining whether there was an "urgent need" to take action, the "gravity of the underlying offense" is considered "an important part of [the] constitutional analysis." *Welsh*, 466 U.S. at 751-52. Here, there was no "underlying offense," only a tip about guns left in an abandoned Maxima. Defendants' counsel conceded that there was no evidence, and no allegation, that Harris was the holder, owner, or trafficker of the illegal guns mentioned by Hemingway.[5] Thus, Pia and O'Hare, who admit that they had no "suspect" in mind, must have had evidence of something more than the existence of guns in order for a jury to reasonably find that exigent circumstances warranted their immediate, tactical entry onto Plaintiffs' property following the receipt of Hemingway's tip.

"The core question is whether the facts, as they *appeared at the moment of entry*, would lead a reasonable, experienced officer, to believe that there was an

[5] At the pre-trial conference, the district court directly asked defense counsel, "Do the defendants want the jury to believe that Mr. Harris was involved with some kind of illegal activity relating to guns?" to which defense counsel responded, "No. And that's not the defendants' contentions. It's to paint the picture of why the officers were going there." App'x at 161.

urgent need to render aid or take action." *Simmons*, 661 F.3d at 157 (emphasis added) (alteration and internal quotation marks omitted). Viewing the evidence in the light most favorable to Defendants, and crediting O'Hare and Pia's testimony that they went over to 297 Enfield Street in order to seize two illegal guns stashed in an abandoned car, the record lacks any evidence of an "urgent need to . . . take action." *See id.* First, it is undisputed that the property was entirely surrounded by a chain link fence, making much of the property visible from the street. Pia acknowledged that from the front of the property, "you could see [the backyard] from different angles." Trial Tr. Vol. II at 278. Though he noted that his view of the backyard was obstructed from "our angle," *id.*, he also conceded that he and O'Hare did not try to drive around the property, or try to see what they could observe from the street, prior to parking and entering the property. *Id.* at 272. Second, at the moment of the officers' entry, no Nissan Maxima was located on or near the property. There was only one vehicle—Harris's SUV—parked in the driveway, though Defendants paid no attention to the SUV as they entered the premises. Hemingway had stated that the guns would be stashed in the Maxima, and the officers' testimony confirms that they saw no vehicles when they first entered the property. Thus, on this

record, and under the standard governing exigent circumstances, a reasonable, experienced officer would not have perceived sufficient evidence giving rise to an urgent need to take action at the moment of the warrantless entry.

"[A]bsent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted). Thus, mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency. *See Simmons*, 661 F.3d at 157-58 ("Of course, *absent such an urgency*, the gun alone did not justify the officers' search of the bedroom.") (emphasis added); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) ("The mere presence of firearms does not create exigent circumstances.").

In the rare cases where we have found exigent circumstances to be present on account of a firearm, the firearm is only one of multiple factors that are found to contribute to the urgency. For example, in *MacDonald*, New York City's drug enforcement task force had observed "numerous indications that a retail narcotics exchange was being operated" out of an apartment, and an undercover

29

officer had entered into the apartment for an undercover drug purchase. 916 F.2d at 768. While in the apartment, the undercover officer saw two loaded weapons. *Id.* There, our Court concluded that a warrantless entry that occurred *subsequent* to the officer's confirmation of the presence of drugs and weapons in the apartment, was reasonable under the Fourth Amendment. *See id.* at 773.

Similarly, in *United States v. Brown*, we affirmed the district court's denial of a suppression motion on the basis of exigent circumstances where officers who violated the knock and announce rule were investigating the underlying offense of trafficking in crack cocaine and heroin and "the use of a firearm incident to that trafficking," and "the suspects were reasonably believed to be armed" in light of a past attempt to collect a drug-related debt from a confidential informant with a "pump-action shotgun." 52 F.3d 415, 421 (2d Cir. 1995).

In *United States v. Crespo*, we also found exigent circumstances based on several of the *Dorman* factors, and noted that "Crespo's prior use of guns made it reasonable to believe he was either armed when he answered Polkowski's knock, or that he would arm himself immediately upon retreating into his apartment." 834 F.2d 267, 270-71 (2d Cir. 1987). *See also United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992) (affirming denial of motion to suppress, in light of several *Dorman*

30

factors favoring exigent circumstances, where officers had probable cause to believe there was an ongoing, large-scale cocaine sale operation on the premises, a confidential informant had informed the DEA that firearms that were used for protection were kept in the apartment, and the officers confirmed through their attempt to knock and talk that there were individuals hiding in the apartment where the confidential informant had reported that the suspects were waiting to receive the proceeds of a drug sale); *United States v. McCoy*, 407 Fed. App'x 514, 515 (2d Cir. 2010) (affirming district court's ruling that exigent circumstances justified officers' warrantless entry where officer received information over the dispatch radio that someone might be inside defendant's home with a firearm that had been used to physically assault another person, and where, despite a statement by defendant's girlfriend that no one was home, police officer heard noise coming from inside the house). Each of these cases involved evidence of more than a mere tip about the presence of an illegal gun.[6] We decline to extend

---

[6] Cases in our sibling circuits that have found exigent circumstances justifying warrantless entry have similarly involved more than a tip about the presence of a contraband firearm. *See, e.g.*, *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (holding police officers' plain view of handgun through closed screen door of apartment, during "knock and talk" initiated after receipt of tip concerning illegal drug activity at apartment, supplied exigent circumstance permitting officers' warrantless entry to secure gun; resident and second occupant were aware of officers' presence and gun was near second occupant),

31

the exigent circumstances exception to occasions in which the only claimed urgency is the alleged presence of a firearm.

Thus, Hemingway's tip did not create exigencies on its own. Defendants also argue that exigent circumstances could be created solely based on the officers' past experience with Hartford. We disagree. Taken to its logical end, this argument would permit exigent circumstances anytime there is a tip about illegal guns being located somewhere in a high-crime neighborhood or city, and would allow the exception to swallow the rule.[7] "[T]he general label 'high crime area' is not a substitute for analysis of the underlying testimony," *United States v. Freeman*, 735 F.3d 92, 101 (2d Cir. 2013), and a warrantless search "must be strictly circumscribed by the exigencies which justify its initiation," *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)). Notwithstanding the officers' description of Hartford as a "high-

*cert. denied*, 534 U.S. 861 (2001); *United States v. Barrientos*, 758 F.2d 1152, 1159 (7th Cir. 1985) (holding exigent circumstances justified a no-knock search where the police had reason to believe the defendants were armed and dangerous and that the occupants of the premises had substantial quantities of cocaine which could have been destroyed or disposed of quickly had the police given warning of their presence).

[7] Notwithstanding this conclusion, we reject Plaintiffs' assertions on appeal that the district court abused its discretion in admitting evidence that Hartford was a dangerous city that suffered from incidents of gun violence.

crime area," the record does not reflect relevant evidence of criminal risk proximal to Harris's property. We disagree with Defendants' proffered vision of police work—one which overvalues "high crime rates" as a factor to be considered in finding exigent circumstances.[8]

Defendants' assertions that it would have been far more intrusive to "attempt to secure the parcel of property while a warrant was prepared," given that Harris's property was surrounded on three sides by other privately owned parcels, are inapposite. The fact that it may have been more tedious to secure the property at 297 Enfield Street while a warrant was obtained does not create exigency. We further note that aside from there being no urgency created by Hemingway's tip about the firearms in and of itself, there is no evidence that the officers sought to corroborate the tip prior to their entry. The officers did not attempt to "knock and talk" or to learn who lived at 297 Enfield Street prior to arriving on the scene with their weapons out in a "tactical approach." Trial Tr.

---

[8] High crime rates alone, while relevant, do not necessarily trigger exigent circumstances. *See Simmons*, 560 F.3d at 108 ("It is a relevant consideration, though by no means dispositive, that the officers, upon arrival, encountered Simmons along with a gathering of people at the apartment building, late at night, and in a high-crime area.").

Vol. II at 277; Trial Tr. Vol. III at 620. These facts underscore the inappropriateness of the exigent circumstances exception to this case.

Accordingly, we conclude that there was insufficient evidence of urgency, and that the exigent circumstances exception to the warrant requirement was therefore not applicable on the evidence presented at trial. Because police officers require "either a warrant or probable cause plus exigent circumstances in order to make a lawful entry," *Kirk*, 536 U.S. at 638, the invasion of Plaintiffs' curtilage without a warrant violated the Fourth Amendment.

### 4. Remedy

Two conclusions follow from our Fourth Amendment analysis. First, on account of the insufficient evidence of urgency, the jury should not have been instructed on the exigent circumstances exception.[9] Because the jury explicitly found exigent circumstances present when it responded to the special

---

[9] "A litigant is entitled to an instruction on a claim where that claim is supported by evidence of probative value." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "All that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Id.* While it would have been useful for our review to have a transcript of the district court's reasons for including this jury instruction, the record clearly reveals that there was insufficient probative evidence of urgency to justify the instruction.

interrogatories, the erroneous instruction plainly prejudiced Plaintiffs' case. *See*

*Girden v. Sandals Intern.*, 262 F.3d 195, 203 (2d Cir. 2011).

Second, the court erred in denying Plaintiffs' Rule 50 and 59 motions on this issue. Rule 50(e) controls where, as here, "the verdict loser appeals from the trial court's denial of a motion for judgment as a matter of law," *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000), and provides that "[i]f the appellate court reverses the judgment, it may order a new trial, direct the trial court to determine whether a new trial should be granted, or direct the entry of judgment," Fed. R. Civ. P. 50(e). "[A]ppellate rulings on post-trial pleas for judgment as a matter of law call for the exercise of informed discretion," with particular focus on "fairness to the parties." *Weisgram*, 528 U.S. at 454 (citing *Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 17 (1967)). When determining the appropriate remedy, "fairness concerns should loom as large when the verdict winner, in the appellate court's judgment, failed to present sufficient evidence." *Id.*

Plaintiffs ask that the judgment be reversed and also assert that the verdict and the erroneously given jury instructions invalidated the jury's verdict on the remaining substantive due process and state law claims. We agree with Plaintiffs that the lawfulness of Defendants' warrantless entry is a threshold issue for the

35

remainder of Plaintiffs' asserted claims, which the jury consequently rejected. We therefore remand for a new trial to determine damages for the Fourth Amendment violation as well as any issues raised by Plaintiffs' remaining claims. *See Brooks v. Brattleboro Mem'l Hosp.*, 958 F.2d 525, 530 (2d Cir. 1992) ("It is well established that a partial new trial may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.") (internal quotation marks omitted).

### B. Qualified Immunity

Defendants ask us to find that they are entitled to qualified immunity. Below, the district court denied Defendants' motion for summary judgment on the basis of qualified immunity and Defendants did not file interlocutory appeals challenging this denial. After trial, the district court again denied Defendants' Rule 50 motion for qualified immunity as moot upon holding that sufficient evidence supported the jury's verdict of no liability.

"Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate clearly established rights or if it would have been

36

objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Reuland v. Hynes*, 460 F.3d 409, 419 (2d Cir. 2006) (internal citations omitted). "Because qualified immunity is an immunity from suit—not merely an immunity from judgment—assertions of qualified immunity should be addressed as early as possible in the judicial process." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We think it appropriate here to consider the issue of qualified immunity in the first instance, because the underlying facts material to this determination are not in dispute and "the ultimate legal determination whether a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (alterations omitted) (citing *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir.), *cert. denied*, 498 U.S. 967 (1990)).

In determining whether the officers are entitled to qualified immunity, the key question is "whether the right in question was 'clearly established' at the time of the violation." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). In 2008, when the shooting took place, it was clearly established that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful

entry into a home." *Kirk*, 536 U.S. at 638. It was similarly "settled doctrine that probable cause for belief that certain articles subject to seizure are in a dwelling cannot of itself justify a search without a warrant." *Jones v. United States*, 357 U.S. 493, 497 (1958). As discussed above, our prior doctrine makes it abundantly clear that the mere presence of a firearm does not, on its own, create the urgency necessary for exigent circumstances. *See Simmons*, 661 F.3d at 157-58; *Groh*, 540 U.S. at 559. A reasonable officer therefore should have known that it was unlawful to invade Plaintiffs' curtilage under the circumstances.[10]

At the time of the intrusion, it was also clearly established that a fenced-in side or backyard directly abutting a single-family house constitutes curtilage. *Brucuglio v. Proulx*, 67 Fed. App'x 58, 61 (2003) ("At the time of events giving rise

---

[10] Defendants' argument that the officers could have reasonably believed that their conduct was lawful pursuant to the community caretaking doctrine is similarly without merit. While legal ambiguity as to the reach of a doctrine favors qualified immunity, Defendants point us to nothing in the community caretaking jurisprudence that might imply this exception to the warrant requirement would apply to facts at all analogous to the warrantless entry of enclosed residential property at issue here. *Cf. Cady v. Dombrowski*, 413 U.S. 433, 442 (1973) (recognizing the community caretaking exception where officer retrieved firearm from vehicle disabled in accident and towed by police to outdoor, unguarded garage); *United States v. Markland*, 635 F.2d 174 (2d Cir. 1980) (applying community caretaking exception where officer searched item found on public highway after accident). Thus, an officer's professed belief that he was permitted, as a community caretaker, to invade Plaintiffs' curtilage without a warrant in search of illegal guns would not be reasonable.

to this action, it was clearly established that . . . a fenced-in backyard is 'curtilage' entitled to Fourth Amendment protection.") (citing *Dunn*, 480 U.S. at 300; *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *see also United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003) (holding that a yard that was "small, enclosed, adjacent to his house, and located behind his house; under *Dunn*, as a matter of law . . . falls within the curtilage"). Curtilage questions are resolved with reference to four factors, including:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*Dunn*, 480 at 301. The first three of the *Dunn* factors indisputably favor the conclusion that the side and backyard were curtilage. First, the area is in close "proximity . . . to the home." *Dunn*, 480 U.S. at 300. Second, the area is "included within an enclosure surrounding the home." *Id.* Third, the officers had no reason to think that this area was put to any uses other than those associated with a home.

Furthermore, this Court's prior reasoning in *Reilly* "clearly foreshadow[s] a particular ruling on the issue" of curtilage in the present case. *Scott v. Fischer*,

616 F.3d 100, 105 (2d Cir. 2010). Nearly twenty years ago, we concluded that the curtilage of a criminal defendant's home extended to a cottage located 375 feet from the main residence, because the entire property was enclosed by a single wire fence, some hedgerows, and woods, with no interior fencing separating the cottage from the main residence. *United States v. Reilly*, 76 F.3d 1271, 1277-79 (2d Cir. 1996); *see also Dunn*, 480 U.S. at 301 n.4 ("[F]encing configurations are important factors in determining curtilage."). And as in this case, the "actual use" of the land in *Reilly* included such "private activities" as cooking, swimming, *Reilly*, 76 F.3d at 1278, and other "intimate activity associated with the sanctity of a . . . home and the privacies of life," *Dunn*, 480 U.S. at 300.

As the Supreme Court has explained, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Oliver*, 466 U.S. at 182 n.12; *see also Florida v. Jardines*, 133 S. Ct. 1409, 1414-15 (2013) (identifying a front porch as an "easy case" under the "ancient and durable" common law principles of curtilage, which would regard the porch as an "exemplar of an area adjacent to the home and to which the activity of home life

40

extends"). This case provides no exception. Accordingly, it would not have been "objectively reasonable" for the officers to believe their acts did not encroach upon Plaintiffs' protected curtilage. *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009). Based upon the foregoing, we conclude that the officers are not entitled to qualified immunity for their Fourth Amendment intrusion.

## CONCLUSION

Because the police officers lacked a warrant or probable cause plus exigent circumstances to invade Plaintiffs' curtilage, and because Defendants cannot offer any other basis on which the officers' intrusion would be lawful, we conclude that Defendants violated Plaintiffs' Fourth Amendment rights. We also hold that Defendants are not entitled to qualified immunity for this violation because, under the undisputed facts, it would not have been objectively reasonable for them to have believed that their conduct was lawful. We therefore reverse the judgment of the district court and remand for a new trial on the issue of damages. We leave to the parties and to the sound discretion of the district court the question of which of Plaintiffs' remaining claims, if any, should also be submitted to the jury at retrial.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.