*13-3329-cr*
United States v. Andino

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2013
No. 13-3329-cr

UNITED STATES,
*Appellant*,

*v.*

YVETTE L. ANDINO,
*Defendant-Appellee,*


THURMAN ARTIS, AKA
PEEPERS, ANDERSON
MONTANEZ,
*Defendants.*


Appeal from the United States District Court
for the Western District of New York.
No. 12-CR-13 — William M. Skretny, *Chief Judge.*


ARGUED: JUNE 25, 2014
DECIDED: SEPTEMBER 16, 2014


Before: CABRANES, CARNEY, and DRONEY, *Circuit Judges.*

The Government appeals from an order of the U.S. District Court for the Western District of New York (William M. Skretny, *Chief Judge*) granting defendant Yvette Andino's motion to suppress cocaine seized by law enforcement officers after a warrantless entry into her home. The district court adopted a report and recommendation (Jeremiah J. McCarthy, *Magistrate Judge*), which held that the seizure was unlawful because the exigent circumstances that justified the officers' initial entry had ended before they discovered the cocaine.

We hold that the district court erred in determining that exigent circumstances did not continue to exist at the time of the discovery of the cocaine. Accordingly, we **REVERSE** the portion of the order of the district court granting Andino's motion to suppress and **REMAND**.

MARY CATHERINE BAUMGARTEN, Assistant United States Attorney (Stephan J. Baczynski, Assistant United States Attorney, *of counsel*), *for* William J. Hochul, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellant United States*.

JOHN P. PIERI, Buffalo, NY, *for Defendant-Appellee Yvette L. Andino*.

DRONEY, *Circuit Judge*:

Defendant-Appellee Yvette Andino was indicted in the Western District of New York for possession with intent to distribute cocaine and related charges after law enforcement officers conducted a warrantless entry into her home and seized cocaine from her kitchen. The U.S. District Court for the Western District of New York (Skretny, *C.J.*) issued an order suppressing the evidence, adopting Magistrate Judge Jeremiah J. McCarthy's Report & Recommendation ("R&R"). The magistrate judge concluded that exigent circumstances justified the officers' initial warrantless entry into Andino's home, but those circumstances ended when the officers obtained physical control over Andino. Therefore, the R&R concluded, the subsequent search and seizure of cocaine was unlawful.

On appeal, the Government contends that a plastic baggie containing cocaine found in Andino's kitchen sink was improperly suppressed because exigent circumstances — the imminent

destruction of that evidence — continued to exist even after Andino was secured in her living room. While we agree with the district court that exigent circumstances justified the warrantless entry into Andino's home, we conclude that the district court erred in determining that exigent circumstances did not also justify the officers' warrantless entry into her kitchen. Accordingly, we REVERSE the portion of the order of the district court that suppressed the evidence seized from the kitchen and REMAND.

## BACKGROUND

**I.     Factual Background**

The following is taken from the district court's decision adopting the magistrate judge's findings of fact based on an evidentiary hearing on the motion to suppress.

At approximately 8 p.m. on August 29, 2011, officers and agents assigned to the U.S. Drug Enforcement Administration ("DEA") Task Force in Buffalo, New York, arrested Anderson

Montanez and Thurman Artis. Montanez was defendant-appellee Andino's boyfriend; they lived together in a house on Norfolk Avenue in Buffalo with their two children.

Montanez and Artis were arrested for their involvement in a series of controlled sales of cocaine to an informant cooperating with the Task Force. Montanez and Artis had traveled together to several locations to pick up cocaine and then traveled back to the area near the Norfolk Avenue home to conclude the sales. At the time of Montanez's arrest, police recovered cocaine from his pocket.

After his arrest, Montanez was brought to the DEA office and questioned by DEA agents. He told the agents that he had "a couple" of ounces of cocaine inside of a book bag at his house on Norfolk Avenue. Montanez said he was concerned about Andino being arrested and the agents explained that "[they] would like to just go to the house, retrieve the cocaine[,] and that would be it." J.A. 58. Montanez provided the officers a written consent to search the

residence and told them Andino would know where the cocaine was located.

At approximately 11 p.m., a team consisting of federal and local law enforcement personnel wearing DEA vests and windbreakers arrived at Andino's house. Some of the officers, including DEA Special Agent Brian Chella, approached the front door of the house. Other officers went to the side of the house where there was a side entrance, driveway, and a window. Task Force Officer Kerry Jones stood by the side window, while DEA Special Agent David Leary was by the side door.

After agents knocked and rang the doorbell, Andino opened the inner door at the front entry. At that point Agent Chella identified himself, and informed Andino that Montanez had been arrested by the DEA, had told the agents there was cocaine in the house, and had given consent to search the house and seize the cocaine. Andino asked to see a copy of the consent to search form,

but as another officer held it up to show her she slammed the door shut. Agent Chella heard Andino running away from the door. Officer Jones then heard a faucet begin to run in the kitchen and drawers being opened and closed, prompting him to yell to the other officers that "drugs or evidence" was being destroyed. J.A. 123. Agent Chella then made his way to the side of the house where he "also heard the kitchen sink." J.A. 62.

Believing that Andino was in the process of destroying the cocaine, officers attempted to open the side and front doors, but were unable to do so. Agent Chella entered the home by removing a window air conditioning unit in the first floor living room and entering through the window. He saw two children sleeping on a couch. Andino then emerged from the kitchen and entered the living room. Agent Chella directed her to open the front door to allow the rest of the search team to enter, which she did.

Upon entering through the front door, two DEA agents remained with Andino and her two children in the living room while Agent Chella and another officer conducted a protective sweep of the upstairs in an effort to secure the house.[1] Others in the search team, including Officer Jones, went into the kitchen where the faucet was still running. In turning the faucet off, Officer Jones discovered and seized a plastic baggie in the sink containing a milky white residue. The bag and its contents were subsequently submitted for analysis that confirmed the residue was cocaine. Andino was placed under arrest at the scene.

**II.  Procedural History**

Andino was named in an indictment with Montanez and Artis and charged with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); maintaining a place for the

---

[1] After clearing the second floor, Agent Chella noticed the book bag described by Montanez on the staircase ledge on the second floor and seized it.

purpose of unlawfully distributing a controlled substance, in violation of 21 U.S.C. § 856(a) and 18 U.S.C. § 2; and destroying property to prevent the government from seizing it, in violation of 18 U.S.C. § 2232(a). Before trial, she filed a motion to suppress physical evidence, including the plastic baggie and cocaine retrieved from her kitchen sink.[2]

On February 17, 2013, following an evidentiary hearing, the magistrate judge issued a recommended ruling concluding that Andino's motion should be granted. The magistrate judge found that "[Andino's] reaction to the appearance of officers [was] the verbal, visual or aural equivalent of the police are here, destroy the

---

[2] The motion to suppress was filed jointly by Montanez and Andino. It included both the cocaine found in the kitchen sink and the book bag found on the second floor. The motion was denied in its entirety as to Montanez on the basis of the consent to search he provided to the Task Force. Montanez did not appeal that portion of the ruling and subsequently pled guilty. With respect to Andino, the district court granted the motion as to the book bag found on the second floor; the court concluded that the exigent circumstances, which the magistrate judge found justified the entry into the house, did not extend to the search of the second floor. The government did not appeal that aspect of the district court's ruling. Consequently, the only issue in this appeal is whether, as to Andino, the exigent circumstances justified the search of the kitchen.

drugs." J.A. 30 (internal quotation marks omitted). Therefore, exigent circumstances justified the warrantless entry. However, the magistrate judge concluded that those exigent circumstances did not still exist at the time the plastic baggie was located and seized because the officers had already obtained physical control over Andino and secured the house before entering the kitchen. The magistrate judge therefore concluded that the seizure of the cocaine was unlawful.

The district court reviewed the government's objections to the R&R and rejected them. In an order issued on August 6, 2013, the court accepted the recommended ruling of the magistrate judge in its entirety and granted Andino's motion to suppress. This appeal followed, pursuant to 18 U.S.C. § 3731.

## DISCUSSION

In evaluating the grant of a motion to suppress evidence this Court reviews the district court's factual findings for clear error,

-10-

viewing them in the light most favorable to the defendant, and its conclusions of law *de novo. United States v. Murphy*, 703 F.3d 182, 188-89 (2d Cir. 2012). "The reasonableness of police action is a 'mixed question of law and fact' that is reviewed *de novo*. Therefore, the ultimate determination of whether a search was objectively reasonable in light of exigent circumstances is a question of law reviewed *de novo*." *United States v. Marin Moreno*, 701 F.3d 64, 72 (2d Cir. 2012) (quoting *United States v. Reyes*, 353 F.3d 148, 151 (2d Cir. 2003)), *cert. denied*, 133 S. Ct. 2797 (2013). "Given the heavily fact dependent nature of the . . . inquiry" into whether exigent circumstances existed to justify a search, "the lower court decision will almost invariably rest on factual determinations about the extent of the exigency, and therefore our review is usually, in practice, for clear error. Under clear-error review, we must be left with the definite and firm conviction that a mistake has been committed in order to reverse a district court's exigent

-11-

circumstances finding." *Id.* (internal citations and quotation marks omitted). Applying either a *de novo* review or one for clear error, we conclude that the district court's determination that the exigency had ended must be reversed.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). However, "the warrant requirement of the Fourth Amendment must yield" where "exigent circumstances require law enforcement officers to act without delay." *Marin Moreno*, 701 F.3d at 72-73 (internal quotation marks omitted). "'[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search.'" *Id.* at 73 (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)).

To determine whether a warrantless entry is justified by exigent circumstances, we employ an objective inquiry that "turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc). "The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action." *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) (internal citation and quotation marks omitted).

In answering this question, we often refer to six factors described in *United States v. MacDonald*,[3] but "[t]hese factors are not

---

[3] These factors are:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape

-13-

germane in every exigent circumstances situation," *Marin Moreno*, 701 F.3d at 73. "Sometimes the presence of a solitary factor [like destruction of evidence] suffices." *MacDonald*, 916 F.2d at 770 (citing *United States v. Gallo–Roman*, 816 F.2d 76, 79-80 (2d Cir. 1987)); *see United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995) (noting that an additional factor is whether "quick action is necessary to prevent the destruction of evidence").

Where a warrantless search is justified by exigent circumstances, the search "must be strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (internal quotation marks omitted); *accord Klump*, 536 F.3d at 118. An officer's conduct once he is inside the premises must

---

if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (en banc) (omission in original and internal quotation marks omitted).

be assessed on a case-by-case basis, taking into account the type of emergency that appeared to be present. *Tierney v. Davidson*, 133 F.3d 189, 196-98 (2d Cir. 1998). "'The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry.'" *Id.* at 197-98 (quoting 3 Wayne R. LaFave, *Search and Seizure* § 6.6(a), at 400-01 (3d ed. 1996)). For example, "[w]here officials enter private property to fight a fire, . . . the scope of the warrantless search is limited to that reasonably necessary to extinguish the blaze, determine the cause and origin of a fire, and ensure against rekindling." *Klump*, 536 F.3d at 118.

The district court determined that the agents' warrantless entry here was justified by exigent circumstances — the imminent destruction of evidence by Andino. The question presented is whether securing Andino ended the exigency such that the search of the kitchen exceeded that exigency. We conclude it did not. The officers reasonably believed Andino was destroying evidence by

washing cocaine down the kitchen sink. The objective of the warrantless entry was to stop the destruction of evidence, and the officers' entry into the kitchen was limited to achieving the objective that justified the entry. *See Tierney*, 133 F.3d at 196-98.

Contrary to the district court, we conclude that simply securing Andino did not accomplish this purpose. Upon learning that the officers were looking for cocaine, Andino slammed shut the front door, ran from the door, opened and closed drawers, and turned on the kitchen faucet. It was certainly reasonable for the officers to conclude that she was attempting to wash the cocaine down the kitchen sink. The faucet was still running when Andino was seized. It was securing her person *and* turning off the faucet that allowed the agents to stop the destruction of evidence. *See United States v. Leveringston*, 397 F.3d 1112, 1116-1118 (8th Cir. 2005) (holding that where officers heard running water and a grinding garbage disposal, warrantless entry was justified by the need to

prevent the imminent destruction of evidence despite the fact that the suspect had already been apprehended). Therefore, the officers' entry into the kitchen after physically securing Andino was justified by continuing exigent circumstances. The search did not exceed the exigency.

It follows then that the seizure of the bag of cocaine was lawful under the "plain view" doctrine. The "plain view" doctrine is another well-recognized exception to the Fourth Amendment warrant requirement, *Ruggiero v. Krzeminski*, 928 F.2d 558, 561-62 (2d Cir. 1991), whereby "law enforcement personnel may seize an item without a warrant provided that it is immediately apparent that the object is connected with criminal activity, and further provided that the officers viewed the object from a lawful vantage point — i.e., that the officers have not violated the Fourth Amendment in arriving at the place from where they can see the object," *United*

*States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 81 (2d Cir. 2002) (internal quotation marks omitted).[4]

Upon entering the kitchen to turn off the sink, Officer Jones observed a plastic baggie in the sink with "white milky residue inside." J.A. 125. The officers had been informed by Montanez that he kept cocaine in the house, and plastic baggies are known "tools of the [narcotics] trade." *United States v. Perez*, 144 F.3d 204, 208 (2d Cir. 1998). Thus, the officers also had probable cause to suspect the baggie was connected with criminal activity. Having already concluded that the officers did not violate the Fourth Amendment in entering the kitchen, and therefore viewed the evidence from a lawful vantage point, we hold that the plastic baggie was properly seized under the "plain view" doctrine.

---

[4] The "plain view" doctrine has alternatively been framed in terms of "probable cause": "First, the initial intrusion by the police officer must be lawful so that he can justify being in a position to make his discovery. Second, the discovery of evidence must be inadvertent. Third, the police must have had probable cause to believe that the item seized was evidence of a crime." *Ruggiero v. Krzeminski*, 928 F.2d 558, 561 (2d Cir. 1991) (internal quotation marks and alterations omitted); *see also United States v. Gamble*, 388 F.3d 74, 76-77 (2d Cir. 2004) (per curiam); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998).

Andino argues that we should affirm the district court's order on the alternate ground that the officers lacked authority to enter her home in the first instance because exigent circumstances justifying entry did not exist.[5] *See United States v. Swarovski*, 557 F.2d 40, 49 (2d Cir. 1977) (holding that 18 U.S.C. § 3731 allows a defendant to "assert grounds for affirming the order of suppression"). But we hold that the district court did not err in concluding that exigent circumstances existed to justify the initial warrantless entry. "[T]he facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to . . . take action" to prevent the destruction of evidence. *Klump*, 536 F.3d at 118 (internal citation and quotation marks omitted).

After being arrested for selling cocaine to a cooperating informant and after a search of his pocket revealed cocaine,

---

[5] Andino's refusal of consent to search abrogated the consent given by Montanez. *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006).

-19-

Montanez told the agents that he had a substantial amount of cocaine at the house he shared with Andino and that she knew where it was located. When the officers approached the house, it was thus eminently reasonable for them to believe there was cocaine inside and that Andino was aware of it as well as its location. *See Marin Moreno*, 701 F.3d at 73-75 (finding that agents had probable cause to believe occupant was in possession of drugs). Moreover, in *United States v. Marin Moreno*, we held that the sudden and forceful attempt to slam shut a door to a motel room that had just been opened for an officer contributed to the circumstances justifying the need to enter the room to ensure that evidence was not destroyed. *Id.* at 74-75. Here the officers identified themselves to Andino, told her why they were there, and attempted to show her the consent to search for the cocaine. Not only did Andino "slam shut a door she had just opened," *id.* at 74, but officers also heard footsteps running away from the door, a faucet turn on, and drawers being banged

opened and closed. These are "classic sounds indicating destruction of evidence." *See United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir. 1980). Where the officers had a sound basis to believe cocaine was in the house and that Andino knew about it, Andino's slamming of the front door plus these "sounds of destruction of evidence established exigent circumstances sufficient to justify the warrantless [entry]." *Id.*

Andino also argues that the officers did not have authority to be on Andino's premises after she refused them entry by shutting the front door.[6] She asserts that their subsequent observations cannot form the basis of exigent circumstances. When an officer lawfully knocks on the door, the occupant's subsequent conduct may contribute to exigent circumstances justifying an entry. *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) ("Occupants who choose not to stand on their constitutional rights but instead elect to attempt to

---

[6] Andino does not contest that the officers' approach was lawful; she only challenges their continued presence immediately after she slammed shut the door.

destroy evidence have only themselves to blame for the warrantless exigent-circumstances search that may ensue."); *Marin Moreno*, 701 F.3d at 73-75 (explaining how warrantless search was justified by the occupant's reaction to seeing an officer at the door); *id.* at 79 (Carney, J., concurring) (agreeing that occupant's actions upon seeing an agent at the door "inform[] our analysis of whether an exigency existed"); *see also United States v. Martinez-Gonzalez*, 686 F.2d 93, 101 (2d Cir. 1982) (relying on fact that agents heard flushing of a toilet *after* they opened the door but before entering to support warrantless entry); *Gomez*, 633 F.2d at 1005-08 (relying on noises heard after occupant closed the door on the agents). After slamming the door, Andino was heard running to the kitchen, turning on the faucet, and opening and closing drawers. Such observations surely can contribute to the exigent circumstances justifying the entry. For these reasons, we also conclude that the district court did not err in

considering the officers' observations following Andino's refusal of consent.[7]

**CONCLUSION**

For the reasons given above, we REVERSE the portion of the order of the district court that suppressed the evidence seized from the kitchen and REMAND.

---

[7] We emphasize that we do not hold that officers may remain indefinitely in the area immediately surrounding a suspect's home (*i.e.*, the curtilage). This area is considered to be "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (internal quotation marks omitted). "[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion . . . would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." *Id.* at 1414 (internal citation and quotation marks omitted).

Thus, as a general matter, once a resident refuses to consent to a search, officers must leave the property shortly thereafter. *See id.* at 1415-16. Here, however, the record reflects that the officers heard the sounds indicating destruction of drugs almost immediately after Andino slammed the door. We therefore have no occasion to assess precisely how long officers may remain in a suspect's curtilage after consent to search is denied.