12-3839-cr (L)
*United States v. Caraballo*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: January 27, 2016          Decided:  August 1, 2016)

Docket No. 12-3839-cr (L), 14-4203-cr (Con)

---

UNITED STATES OF AMERICA,

*Appellee*,

– v. –

FRANK CARABALLO,

*Defendant-Appellant*,

---

Before: CALABRESI, LYNCH, and LOHIER, *Circuit Judges*.

Defendant-appellant Frank Caraballo appeals from the judgment of the District Court for the District of Vermont (Reiss, *C.J.*), convicting him of a) conspiring to distribute cocaine base, b) possessing a firearm in furtherance of a drug trafficking crime, and c) causing the death of Melissa Barratt. After discovering Barratt's body and reasonably suspecting Caraballo's involvement, the investigating officers had Sprint, Caraballo's cell-service provider, use the GPS software in his phone to locate him remotely—a process called "pinging." Using this location, the officers tracked down Caraballo and arrested him. Prior to trial, Caraballo moved to suppress his post-arrest statements on the basis that the pinging of his phone was a warrantless "search" under the Fourth Amendment.  Because we conclude that the threat to law enforcement justified the search of Caraballo's cell location, and for the reasons given in an accompanying summary order that deals with the other issues that Caraballo has raised in this appeal, we AFFIRM the judgment of the District Court.

---

NATASHA SEN, ESQ., Brandon, Vermont
(Mark Kaplan, KAPLAN AND KAPLAN, Burlington,
Vermont, *on the brief*), *for Defendant-Appellant*

PAUL J. VAN DE GRAAF, *Chief, Criminal Division*, (Joseph R. Perella, Gregory L. Waples, *Assistant United States Attorneys*, *on the brief*), *for* Eric S. Miller, *United States Attorney for the District of Vermont*, Burlington, VT, *for Appellee*

CALABRESI, *Circuit Judge*:

Early in the summer of 2011, Brattleboro police made a series of controlled purchases of narcotics from Frank Caraballo. After the body of Melissa Barratt, an associate of Caraballo's, was discovered on the morning of July 29, 2011, the officers investigating her death asked Sprint, Caraballo's cell-phone provider, to track the GPS coordinates of Caraballo's cell phone over a two-hour period. Sprint complied with the officers' request, and Caraballo was located and apprehended later that day. Caraballo contends that the "pinging" of his cell phone was a search that violated the Fourth Amendment and that, as a result, the District Court's failure to suppress evidence recovered upon his arrest requires reversal of his conviction. Because we conclude that the circumstances justified the officers' warrantless identification of the GPS coordinates of Caraballo's phone, we AFFIRM the judgment of the District Court.[1]

## BACKGROUND

**The Scene.** At approximately 10:45 AM on July 29, 2011, officers of the Vermont State Police responded to a report of a woman's body near the town limits of Brattleboro, Vermont. This area was "off the beaten path," in a wooded area approximately 30 yards from the road. *United States v. Caraballo*, 963 F. Supp. 2d 341, 343 (D. Vt. 2013). When the officers arrived,

---

[1] We consider, and reject, Caraballo's remaining challenges to his conviction in a separate summary order issued with this opinion. In the same summary order, we dismiss, for lack of appellate jurisdiction, the purported appeal of his related conviction for narcotics distribution.

2

they found the woman's body. She had a gunshot wound to the back of the head and was on the ground in a kneeling position with her hands clasped in front of her. Based on the body's position, it was apparent that the woman had not committed suicide. Moreover, the lack of a blood trail indicated that she had been shot there. The officers inferred that the homicide had taken place that morning based on a report from a nearby construction crew of a gunshot-like sound earlier in the morning.[2] As a result, the officers "suspected that the woman was a victim of a homicide and that her assailant could still be armed." *Id.*

The officers identified the woman as Melissa Barratt. Barratt had recently come to the attention of Vermont State Police when she was arrested in Brattleboro for selling drugs on May 31, 2011. At the time, Barratt had told her arresting officers that she was "extremely nervous and afraid of Frank Caraballo," with whom she worked dealing drugs. *Id.* In particular, she stated that "if he knew that she was talking to [the officer], he would hurt her, kill her." *Id.* This, she indicated, was not an idle threat, as she knew Caraballo to have access to multiple firearms, and to have committed assault or even homicide on previous occasions. *Id.* Though the arresting officers sought to have Barratt cooperate with them in an investigation of Caraballo, she refused, largely out of fear that she would "basically be killed" if she did so. *Id.* The officers at the scene subsequently learned that Barratt had continued to work for Caraballo after her release.

Moreover, the investigating officers knew that, after Barratt's arrest, Brattleboro police had conducted an investigation of Caraballo's drug operation. Through June and July, police completed "at least three recent controlled buys of narcotics" with Caraballo, *id.* at 344, and these sales required the participation of multiple undercover agents and confidential informants. Through these sales, the police knew two phone numbers that Caraballo had used in connection

[2] It was later learned that Barratt had been killed a day earlier on July 28, 2011.

3

with his operation. They were similarly aware that Caraballo had no residence in Vermont, but instead traveled to and from Massachusetts and stayed in hotels.

In sum, the officers found themselves in a difficult position. They had found a woman who was the subject of a "coldblooded execution." *Id*. Their primary suspect was a man whom the victim had told them not only had a significant propensity for violence but also possessed a number of firearms. In addition, the investigation of Caraballo had separately indicated that he had taken over the drug operation of his brother, Michael, and was as such "armed and dealing drugs." *Id.*

The officers also believed that the local police who had infiltrated Caraballo's drug operation could be harmed if they came into contact with him. As one officer testified, referring particularly to agents and informants involved in the investigation of Caraballo's drug operation:

> I was concerned that if there was information leaked before the homicide occurred we did not know what extent that information was. We knew that we had our narcotics officers in deep working with their [confidential informants] investigating Frank Caraballo. And we were concerned that if there was some sort of information leaked we weren't sure if he was going to be going after any sort of [informants] or narcotic officers at that point.

App. 208. Thus, the officers' belief was that it was necessary to obtain Caraballo's location or "potentially someone [was] going to get hurt or killed." *Id*. at 211.

The officers were also assertedly concerned for the possible destruction or dissipation of evidence. Consistent with this, one officer testified that "access to the potential assailant shortly after the homicide was likely to yield important and irreplaceable evidence" such as gunshot residue and DNA. *Caraballo*, 963 F. Supp. 2d at 345. This evidence would likely dissipate or be destroyed if the assailant was not "promptly apprehended." App. at 211.

4

**The Officers' Response.** The officers considered various methods for tracking down Caraballo. These included a) having a confidential informant contact him, and b) posting police on major roadways to identify his vehicle as it left the state. They also thought of obtaining a search warrant, and, pursuant to that warrant, asking Sprint, Caraballo's cell carrier, to determine the position of the cell phones associated with Caraballo's drug business. As discussed below, Sprint could determine the location of those phones through their global positioning system ("GPS"). The officers, however, viewed the time that it would take to secure this information by search warrant prohibitory. This was because, "in the absence of exigent circumstances," the provider's slow compliance with the warrant would "likely . . . involve 'a huge delay of getting the information.'"[3] *Id.*

Cell phones like Caraballo's can be located in two ways. First, cell phones create a record of their location based on the cell towers near them (called "cell-site" location data or information). Cell phones automatically generate this data when turned on; having phones in constant communication with the network enables calls to be routed appropriately. This process can generate a historical log of a phone's movements, though only with limited precision (here, with a margin for error of about 5,000 meters).

Second, the position of a cell phone can be determined based on its GPS location, which is generated by triangulating the cell phone's position by reference to three or more network satellites. By contrast with cell-site data, this information is generated only at the specific command of a Sprint operator—an action called "pinging"—and is quite precise (here, within a

---

[3] The District Court found that, although the officers' past experience suggested it would take only "six hours before a warrant could be obtained from a state court judge," it would take much more time—"several days or weeks"—before a cell phone provider would provide location data pursuant to this request. *Id.* at 363.

range of 8 to 46 meters). App. 471. If fewer than three satellites are in contact with a phone at the time of a request, however, the ping produces only the phone's less precise, cell-tower location.

The investigating officers believed that applicable law permitted them to request a warrantless search of a phone's GPS location "if there was an emergency involving a threat of serious bodily injury or death." *Caraballo*, 963 F. Supp. 2d at 345-46.[4] They had little experience with this procedure; one officer testified to having requested such information without a warrant "on two previous occasions: one involving a kidnapping and the other involving a missing person." *Id.* Concluding that this was "a legitimate emergency," the officers decided to request that Sprint locate Caraballo's phones through their GPS without securing a warrant. *Id.* This approach was endorsed by the county's state attorney, who agreed that such a search "was appropriate and it was probably the best action to take." *Id.*

The officers then contacted Sprint, which had them fill out a standard form to request the relevant GPS data. This form was submitted at 3:20 pm, and it explained the exigency by stating that a "[m]ale with phones is suspect in possible homicide." *Id.* at 347. Sprint's practice was to provide location information as soon as possible whenever law enforcement submitted such an emergency request form. Accordingly, Sprint accepted the form and agreed to help the officers locate Caraballo's phones. As agreed, the officers would call Sprint to initiate each search, or "ping," of the location of Caraballo's phone. The results of each "ping" would then be immediately conveyed back to them by a Sprint representative.

---

[4] 18 U.S.C. § 2702(c)(4) authorizes cell-phone carriers to provide "a record or other information pertaining to a subscriber to or customer of such service . . . to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency."

**Caraballo is Apprehended.** Sprint's attempts to ping Caraballo's phones began at 3:43 pm. Although one of Caraballo's phones was unresponsive, a ping of another phone hit at 4:03 pm, revealing that this phone was in the Brattleboro area. The officers had Sprint continue to ping this phone—thirteen times in all, with nine providing GPS coordinates and four providing cell-site location information. Through this process they determined that the phone was being transported north on Interstate 91 and had ceased moving at the town center of Springfield, Vermont. The officers then notified local police about Caraballo and, after local police observed Caraballo's car at a nearby McDonald's, the officers pinged his phone two final times, at 5:11 pm and 5:20 pm, to confirm this identification.

From that point on, the officers relied on visual surveillance to track Caraballo. Believing that they had sufficient probable cause to arrest Caraballo for the earlier-mentioned narcotics offenses, police stopped his car and arrested him. Upon arrest, Caraballo made a number of statements to police that the Government would subsequently offer at trial.

**Procedural History.** The Government brought two separate cases against Caraballo. On September 7, 2011, Caraballo was indicted on one count of conspiring to distribute at least 28 grams of cocaine base under 21 U.S.C. §§ 846, 841(a) and 841(b)(1)(B) and on five counts of distributing cocaine base under 21 U.S.C. §§ 841(a) and 841(b)(1)(C). Caraballo pleaded guilty to the distribution counts in May 2012, and the Government dismissed the conspiracy count. On September 13, 2012, the District Court sentenced Caraballo to 200 months' imprisonment on each distribution count to run concurrently, with a lifetime of supervised release. An appeal by Caraballo concerning the sentence in this case is dealt with in a summary order that is issued together with this opinion.

7

Subsequently, on December 5, 2012, Caraballo was indicted on: (1) one count of conspiring to distribute at least 280 grams of cocaine base under 21 U.S.C. §§ 846, 841(a) and 846(b)(1)(A); (2) one count of possessing a firearm in furtherance of a drug trafficking crime and of causing the death of Barratt by discharging a firearm under 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1); (3) one count of possessing a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A); and (4) one count of being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).

Prior to trial on this indictment, Caraballo moved to suppress the evidence recovered following his arrest. Caraballo contended that the pinging of his cell phone constituted a warrantless "search" under the Fourth Amendment. The Government responded by arguing, in relevant part, that (1) the pinging was not a cognizable search under the Fourth Amendment because Caraballo lacked both a subjective and reasonable expectation of privacy in his phone's location, (2) no warrant was necessary for any such search because the officers' actions were justified by exigent circumstances, and (3) exclusion would be inappropriate, in any event, because the officers had acted in good faith in reliance on applicable law.

The District Court denied Caraballo's motion to suppress. *Caraballo*, 963 F. Supp. 2d at 363. First, the Court found that the officers' actions did not constitute a "search" under the Fourth Amendment. Caraballo, it said, lacked a subjective expectation of privacy in the GPS location of his phone, because his contract with Sprint put him "on notice that disclosure of his real time location information to law enforcement [might] occur in the event of an 'emergency.'" *Id.* at 363. Second, and in the alternative, the District Court held that "exigent circumstances alone rendered the warrantless search of Defendant's cell phone location reasonable" and therefore permissible under the Fourth Amendment. *Id.* at 365. Finally, the District Court

8

determined that exclusion of the evidence was, in any event, not warranted because the investigating officers "had a good faith, reasonable belief that applicable law authorized the pinging of Defendant's cell phone in the circumstances of this case." *Id.*

Caraballo proceeded to trial, and was convicted of the first three counts.[5] The District Court denied Caraballo's motion for a judgment of acquittal and, following a motion for reconsideration, the District Court again denied Caraballo's motion for a judgment of acquittal. The Court subsequently sentenced Caraballo to a total term of forty years' imprisonment to run concurrently with the September 13, 2012 drug sentence.

Caraballo appealed.

## DISCUSSION

As we have repeatedly held, "the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay." *United States v. Moreno*, 701 F.3d 64, 72-73 (2d Cir. 2012) (internal quotation mark omitted). In such circumstances, "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (internal quotation marks omitted) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). In the circumstances of this case, we conclude that exigent circumstances justified the police in pinging Caraballo's phone and thereby determining his location.

---

[5] The felon-in-possession count was severed before trial. Caraballo subsequently pleaded guilty to this count.

## A. Standard of Review

On appeal from the denial of a motion to suppress, we review the District Court's factual findings for clear error, "viewing the evidence in the light most favorable to the government," *Moreno*, 701 F.3d at 72. "[T]he ultimate determination of whether a search was objectively reasonable in light of exigent circumstances is a question of law reviewed *de novo*." *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014) (quoting *Moreno*, 701 F.3d at 72 (internal quotation marks omitted)). Nevertheless, "[g]iven the heavily fact dependent nature of the exigency inquiry, . . . the lower court decision will almost invariably rest on factual determinations about the extent of the exigency, and therefore our review is usually, in practice, for clear error." *Moreno*, 701 F.3d at 72.

## B. The District Court's Alternative Grounds

For reasons that will soon be apparent, we begin by discussing briefly the District Court's alternative grounds for not suppressing the evidence derived from the pinging.

The District Court concluded that Caraballo lacked a subjective expectation of privacy in his phone given the terms of Sprint's service agreement and noted that, in any event, such an expectation "is not one society is prepared to accept as reasonable." *Caraballo*, 963 F. Supp. 2d at 363. Other Circuits have considered the reasonableness of such expectations in cases akin to the present one. The Sixth Circuit has found that individuals have no reasonable expectation of privacy in the real-time GPS location of their cell phones. *See United States v. Skinner*, 690 F.3d 772, 777 (6th Cir. 2012). And various Circuits have considered the question of whether the warrantless collection of historical cell-site information violates the Fourth Amendment. *See United States v. Graham*, --- F.3d ---, 2016 WL 3068018, at *4 (4th Cir. May 31, 2016) (en

banc) (finding no reasonable expectation of privacy in historical cell-site information); *United States v. Carpenter*, 819 F.3d 880, 884 (6th Cir. 2016) (same); *United States v. Davis*, 785 F.3d 498, 513 (11th Cir. 2015) (en banc) (same); *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 615 (5th Cir. 2013) (same); *see also In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 313-17 (3d Cir. 2010). Because we conclude that exigent circumstances justified the officers' pinging of Caraballo's phone, we need not today resolve this important and complex Fourth Amendment question.

The District Court also concluded that, even if the officers' actions violated Caraballo's rights under the Fourth Amendment, application of the exclusionary rule would be inappropriate because the officers relied in good faith on 18 U.S.C. § 2702(c)(4). *See Illinois v. Krull*, 480 U.S. 340, 342 (1987) (finding exclusionary rule not applicable where "officers act in objectively reasonable reliance upon a statute authorizing warrantless administrative searches, but where the statute is ultimately found to violate the Fourth Amendment" (emphasis omitted)). Again, because we conclude that exigent circumstances justified the officers' actions, we do not decide whether the officers justifiably relied on 18 U.S.C. § 2702(c)(4).

As we shall see, however, the fact that both an undecided question of whether an underlying privacy interest existed in this case, and that plausible arguments could be made that here the officers acted in a way that was objectively consistent with the law and therefore that suppression is not justified, properly affect our analysis of whether exigency existed in the case before us.

## C. Exigency and Reasonableness

The "core question" in applying the exigent-circumstances doctrine is "whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action." *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) (citation and internal quotation marks omitted). The relevant facts might evidence "the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury." *Riley v. California*, 134 S. Ct. 2473, 2494 (2014). In addressing this question, however, we are "cognizant of the Supreme Court's admonition that exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Harris v. O'Hare*, 770 F.3d 224, 234 (2d Cir. 2014) (internal quotation marks omitted). Moreover, we have cautioned that "general knowledge, without more, cannot support a finding of exigency" because that inquiry must rely on the particular circumstances that create exigency specific to each case. *Id.* at 235.

Exigent-circumstances determinations typically consider the factors listed in *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970) (en banc). These were adopted by our Court in *United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (en banc), and are:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Moreno*, 701 F.3d at 73. Such factors, however, are "illustrative, not exhaustive," *id.* (internal quotation marks omitted), as the determination is an "objective one that turns on [an] examination of the totality of the circumstances" of each individual case, *MacDonald*, 916 F.2d at 769.

Significantly, in making an exigency determination, we have also considered the degree to which the officers, in conducting the search, intruded on a defendant's privacy interests. Thus, as the Court in *Dorman* explained, whether the entry was forceful or peaceful can affect our finding:

> [T]hat the entry, though not consented, is made peaceably [is relevant]. Forcible entry may in some instances be justified. But the fact that entry was not forcible aids in showing reasonableness of police attitude and conduct. The police, by identifying their mission, give the person an opportunity to surrender himself without a struggle and thus to avoid the invasion of privacy involved in entry into the home.

*Dorman*, 435 F.2d at 393. We read this language to mean that the greater the invasion of privacy, e.g., of a person's home, *see Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."), and the clearer the restrictions on police behavior in the absence of exigency, the more stringent the requirements that the search be urgently undertaken in order for the exigency exception to apply. In this respect, exigency analysis incorporates both principles of objectively proper officer behavior and the degree of privacy invasion involved.

That these factors are relevant to an exigent-circumstances determination should not be surprising. In the context of warrantless searches, "[t]he ultimate touchstone of the Fourth Amendment is reasonableness," *King*, 563 U.S. at 459 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (alteration in original)), and the exigent-circumstances analysis is

13

merely a "'finely tuned approach' to Fourth Amendment reasonableness," *Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013) (quoting *Atwater v. Lago Vista*, 542 U.S. 318, 347 n.16 (2001)). Searches that are conducted without any concern for applicable law, that infringe on clearly established privacy interests, or that are broader than necessary to address an exigency are more likely to be harmful as a constitutional matter. And those searches that are constitutionally more harmful are necessarily less reasonable.

## D. Exigency in This Case

Applying the above principles to the case before us makes clear that exigent circumstances justified the officers' pinging of Caraballo's phone following their discovery of Barratt's body.

The Government identifies two possible sources of exigency to justify the officers' pinging of Caraballo's phone. First, the Government contends that the officers reasonably believed that Caraballo posed an imminent threat to law enforcement, particularly those undercover agents and confidential informants involved in the investigation of Caraballo. Second, the Government argues that the delay associated with securing a warrant could result in the imminent destruction or dissipation of evidence. In the circumstances of this case, we conclude that the first source of exigency suffices to support the officers' limited intrusion in Caraballo's privacy from the pinging.[6]

The first two *Dorman*/*MacDonald* factors strongly indicate that the officers' actions were reasonable. First, Barratt's killing was brutal: she was found with a gunshot wound to the

---

[6] Although it is not necessary to resolve the case, we have some doubt as to whether the destruction of evidence would be a sufficient basis for finding exigency in the present case.

14

back of her head, "kneeling . . . [with] her hands folded." App. 198. And, the position of Barratt's body, together with the location of the gunshot, made it apparent that this was "a coldblooded execution." App. 207. Second, the officers had good reason to believe that Caraballo was armed: not only had Barratt been killed by gunshot, but Barratt also had told police, upon her earlier arrest, that Caraballo had "access to guns," including "shotguns, Tech 9s and other types of weapons." *Caraballo,* 963 F. Supp. 2d at 343 (alteration omitted).

As to the third factor, though the officers thought they lacked probable cause to arrest Caraballo on Barratt's murder, they properly considered him their "primary suspect." *Id.* at 364.[7] At the time of Barratt's arrest, she told officers that "she was involved in drug activity in Brattleboro with [Caraballo], that 'she was extremely nervous and afraid of [Caraballo]' and that 'if he knew that she was talking to [the officers], he would hurt her, kill her." *Id.* at 343. Given that Barratt perceived herself to be in significant danger from Caraballo for speaking with police, and given her role in his organization, officers had strong reasons to link Caraballo to Barratt's death. Though this *Dorman* factor does not itself support exigency, it does not cut strongly against it.

More important, however, the officers had specific reasons to think that Caraballo would commit acts of violence against undercover agents and confidential informants. The mere fact of a brutal killing does not necessarily suggest that other violence, either against officers in the field or against civilians, will follow. But here, Barratt's statement that Caraballo would "kill her" if she were speaking to police took on special significance. As one officer testified, her murder suggested that the police's investigation of Caraballo's drug operation had been

---

[7] The officers did believe, however, that there was probable cause to arrest Caraballo for the controlled purchases of narcotics that were the original subject of the investigation. *Caraballo,* 963 F. Supp. 2d at 351.

15

discovered. And, as the District Court noted, the informants "knew [Caraballo] well enough to contact him" by phone and were "likely to be individuals who had encountered [him] on more than a single, remote, or passing occasion." *Id.* at 362. Accordingly, "[i]f the motive for the Barratt homicide was to silence a cooperator, it could extend to the confidential informants as well." *Id.*

Given this specific threat, then, it was not clearly erroneous for the District Court to conclude that the officers had a "legitimate, good faith belief that [Caraballo] must be apprehended immediately to ensure that confidential informants and undercover narcotics agents would not be exposed to an imminent risk of death or serious bodily injury." *Id*. at 362.[8]

Finally, officers did not have a reasonable opportunity to secure a warrant for the search. Although it would take only six hours to obtain a warrant, the officers' experience led them to believe that Sprint would respond much less quickly—to the tune of days or weeks—if pinging were sought through the warrant process. The odds that Caraballo would come into contact with an undercover officer or confidential informant—and potentially kill that person—over this period could reasonably seem to the officers to be anything but remote.[9]

---

[8] Caraballo contends that other elements of the officers' conduct (such as the officers' failure to mobilize local police immediately or to document the emergency) indicate that there was no true exigency and, rather, that the intent of the officers' conduct was simply to collect evidence. The subjective motivations of the officers, however, are "irrelevant" to the determination of whether there was a true exigency. *Brigham City*, 547 U.S. at 404. And to the extent Caraballo argues that these factors objectively indicate that the situation was not exigent, these arguments do not render the District Court's contrary conclusion clearly erroneous. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

[9] In the officers' view, Sprint distinguished between requests made with a warrant and requests—through its emergency process—made without a warrant. The latter category of requests would be acted on rapidly, but the former would be processed in the order in which they

16

At the same time, and significantly, the degree of the officers' intrusion into Caraballo's privacy was relatively slight. First of all, the officers showed due regard for applicable law in conducting their search. In the words of the District Court, the officers "held a good faith, reasonable belief that there was a serious and imminent threat to human life and that *federal law authorized a warrantless cell phone pinging in those circumstances*." *Caraballo*, 963 F. Supp. 2d at 346 (emphasis added). Indeed, not only was this belief consistent with the officers' limited experience with pinging, but it was also endorsed by the county's state attorney, who viewed the course of action as "appropriate." *Id.*

Moreover, contrary to the privacy interests at stake in *Dorman* and *MacDonald*, any expectation of privacy that Caraballo had in his cell-phone location was dubious at best. Indeed, given that the search took place prior to the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), Caraballo would have struggled to point to any authority that would support an argument that he had a reasonable expectation of privacy in this information. *See United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) ("The Supreme Court's decision in [*United States v. Knotts*, 460 U.S. 276 (1983)] stood for the proposition that the warrantless use of a tracking device to monitor a vehicle on public roads did not violate the Fourth Amendment."). Moreover, the fact that the question of the degree of privacy that adheres to these sorts of information, to date, divides those Circuit courts that have spoken to the issue reinforces the conclusion that the intrusion here was not to an established, core privacy value.

---

were received, which could result in significant delay. There are certainly circumstances where it makes perfect sense to take the latter approach. That being said, the preferable approach in this case may have been for the officers to secure a warrant and then insist on *Sprint* applying its emergency process.

17

Finally, the officers' pinging was "strictly circumscribed" to finding Caraballo as quickly as possible. *Andino*, 768 F.3d at 99. It took place over a very short period of time (less than two hours) and ceased immediately upon the officers confirming that the identified vehicle was Caraballo's. And although, given its precision, pinging can provide data "that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations," *Jones*, 132 S. Ct. at 955 (Sotomayor, *J*., concurring), the officers did not attempt to elicit such facts here. They used the GPS coordinates only to trace Caraballo's path generally toward Brattleboro, and then confirmed that a particular car was Caraballo's after it had been identified by local police. Thus, the officers' use of this information was no more expansive than necessary to address the exigency that they perceived existed.

## CONCLUSION

The officers reasonably believed that Caraballo posed an exigent threat to the undercover officers and confidential informants involved in his drug operation. This threat justified the pinging of Caraballo's phone, a) which at most constituted a limited intrusion into his privacy interests, b) which objectively could be viewed as plausibly consistent with existing law and c) which the officers used in the most limited way to achieve their necessary aim. Accordingly, and for the reasons given in an accompanying summary order that deals with the other issues that Caraballo has raised in this appeal, we AFFIRM the judgment of the District Court.